Weldon, J.,
delivered the opinion of the court:
In this case the claimant seeks to enforce against the defendants a liability growing out of certain treaties between the Choctaw Nation on one side and the United States on the other. The claim made by the petition, and sought to be maintained by the evidence, in some of its particulars embraces a period much beyond the life of a generation ; so that we are dealing with a subject-matter of dispute historical in its character, involving a very large sum of money, and comprehending in its decision varied principles of law. The necessities of the case as a judicial proceeding bring before the court the widest range of investigation.
For nearly a century the parties to this record have been in antagonism; their very existence, geographically situated as they were, was an antagonism. The fact that one is the representative of civilized and the other of semi-civilized life is an antagonism, and in the spirit of that antagonism they have met in council, in the executive and legislative branches of the Government, and now, for the first time in the history of their differences, they meet in the forum of the judiciary.
The ordinary jurisdiction of this court does not embrace the claim alleged by the pleading, but by special act of Congress the jurisdiction is enlarged; and, as was said, it is a high compliment to this court that its ordinary jurisdiction is enlarged, and that a case so important in its legal principles and so large in amount should be submitted to the determination of this tribunal.
We therefore approach the investigation and decision of the issues between these parties with a just sense of the responsibility incurred, and a full appreciation of the delicate trust confided to us iu dealing with principles so vital in law and interests so material to the. rights of the litigants.
The record is most voluminous, embracing in its scope more than 2,500 printed pages of evidence, exhibits, and public documents ; but in the discharge of our duty to find the facts upon which to predicate our decision, and the appellate jurisdiction of the Supreme Court, we have eliminated what we regard as extraneous and immaterial, bringing the compass of the case to such findings as will enable the appellate jurisdiction to understand the issues as developed by the proof.
*77 This case being in excess of the ordinary jurisdiction of the court, we quote at length the act under which the claimant’s petition was filed:
“ AN ACT ior the ascertainment, of the amount due the Choctaw Nation.
“Whereas the Choctaw Nation, for itself and on behalf of individual members thereof, makes claim against the United States on account of various treaty provisions which it is alleged have not been complied with: Therefore,
“ Be it enacted by the Senate and Rouse of Representatives in Congress assembled, That the Court of Claims is hereby authorized to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the Choctaw Nation, and to render judgment thereon; power is hereby granted the said court to review the entire question of differences de novo, and it shall not be estopped by any action had or award made by the Senate of the United States in pursuance of the treaty of eighteen hundred and fifty-five; and the Attorney-General is hereby directed to appear in behalf of the Government; and if said court shall decide against the United States the Attorney-General shall, within thirty days from the rendition of judgment, appeal the cause to the Supreme Court of the United States; and from any judgment that may be rendered, the said Choctaw Nation may also appeal to said Supreme Court: Pro vided, The appeal of the said Choctaw Nation shall be taken within sixty days after the rendition of said judgment, and the said courts shall give such cause precedence.
“ Sec. 2. Said action shall be commenced by a petition stating the facts on which said nation claims to recover, and the amount of its claim ; and said petition may be verified bj either of the authorized delegates of said nation as to the existence of such facts, and no other statements need be contained in said petition or verification.
Approved March 3, 1881.”
In order to understand the synopsis which is given of the petition in this opinion, it is necessary in this connection to call attention to a treaty made in 1855 between the nation and the United States, and the action of the Senate under and by virtue of the provisions of said treaty. So much of it as it is necessary to consider at the present is as follows:
“Whereas the political connection heretofore existing- between the Choctaw and the Chickasaw tribes of Indians has given rise to unhappy and injurious dissensions and controversies among them, which render necessary a readjustment of their relations to each other and to the United States;
“ And whereas the United States desire that the Choctaw Indians shall relinquish all claim to any territory west of the *78 one hundredth degree of west longitude, and also to make provision for the permanent settlement within the Choctaw country of the Wichita and certain other bands of Indians — for which purpose the Choctaws and Ohickasaws are willing to lease, on reasonable terms, to the United States that portion of their common territory'wbich is west of the ninety-eighth degree of west longitude; and whereas the Choctaws contend that by a just and fair construction of the treaty of September 27, 1830, they are of right entitled to the net proceeds of the lands ceded by them to the United States under said treaty, and have proposed that the question of their right to the same, together with the whole subject-matter of their unsettled claims, whether national or individual, against the United States, arising under the various provisions of the said treaty, shall'be referred to the Senate of the United States for final adjudication and adjustment;
“And whereas it is necessary for the simplification and better understanding of the relations between the United States and the Choctaw Nation of Indians that all their subsisting treaty stipulations be embodied in one comprehensive instrument.”
Following said preamble, as articles of said treaty, are sections XI and XII, as follows:
“Article XI. The Government of the United States not being prepared to assent to the claim set up under the treaty of September 27,1830, and so earnestly contended for by the Choctaws as a rule of settlement, but justly appreciating the sacrifices, faithful services, and general good conduct of the Choctaw people, and being desirous that their rights and claims against the United States shall receive a just, fair, and liberal consideration, it is therefore stipulated that the following questions be submitted for adjudication to the Senate of the United States:
“ First. Whether the Choctaws are entitled to, or shall be allowed, the proceeds of the sale of the lauds ceded by them to the United States by the treaty of September 27, 1830, deducting therefrom the cost of their survey and sale, and all just and proper expenditures and payments under the provisions of said treaty; and, if so, what price per acre shall be allowed to the Choctaws for the land remaining unsold, in order that a final settlement with them may be properly effected; or
“ Secondly. Whether the Choctaws shall be allowed a gross sum in further and full satisfaction of all their claims, national and individual, against the United States; and, if so, liow much.”
# # # # * # #
“Article XII. In case the Senate shall award to the Choctaws the net proceeds of the lands ceded as aforesaid, the same *79 shall be received by them in full satisfaction of all their claims against the United States, whether national or individual, arising under any former treaty; and the Choctaws shall thereupon become liable and bound to pay all such individual claims as may be adjudged by the proper authorities of the tribe to be equitable and just, the settlement and payment to be made with the advice and under the direction of the United States agent for the tribe; and so much of the fund awarded by the Senate to the Choctaws as the proper authorities thereof shall ascertain and determine to be necessary for the payment of the just liabilities of the tribe shall, on their requisition, be paid over to them by the United States; but should the Senate allow a gross sum in further and full satisfaction of all their claims, whether national or individual, against the United States, the same shall be accepted by the Choctaws, and they shall thereupon become liable for and bound to pay all the individual claims as aforesaid, it being expressly understood that, the adjudication and decision of the Senate shall be final.”
In pursuance of the submission under this treaty the Senate, on the 9th day of March, 1859, passed and caused to be entered of record on its journals, as the result of its investigation, the following preamble and resolutions:
“ Whereas the eleventh article of the treaty of June 22,1855, with the Choctaw and Chickasaw Indians provides that the following questions be submitted for decision to the Senate of the United States:
“First, whether the Choctaws are entitled to or shall be allowed the proceeds of the sale of the lands ceded by them to the United States by the treaty of September 27,1830, deducting therefrom the costs of their survey and sale, and all just and proper expenditures and payments under the provisions of said treaty; and if so, what price per acre shall be allowed to the Choctaws for the lands remaining unsold, in order that a final settlement with them may be promptly effected ; of,
“ Secondly, whether the Choctaws shall be allowed a gross sum in further and full satisfactiou of all their claims, national and individual, against the United States; and if so, how much:
“Resolved, That the Choctaws be allowed the proceeds of the sale of such lands as have been sold by the United States on the first day of January last, deducting therefrom the costs of their survey and sale, and all proper expenditures and payments under said treaty, excluding the reservations allowed fnd secured,' and estimating the scrip issued in lieu of reserva-ions at the rate of $1.25 per acre; and, further, that they be also allowed 12¿- cents per acre for the residue of said lands.
“Resolved, That the Secretary of the Interior cause an account to be stated with the Choctaws, showing what amount is due *80 them according to the above-prescribed principles of settlement, and report the same to Congress.”
It is alleged that in pursuance of the award made by the Senate under the treaty of 1855, the Secretary of the Interior caused an account to be stated with the Choctaws showing $2,981,247.30 due them for lands sold under the treaty of September 27, 1830; and that such finding was by the Secretary transmitted to Congress in June, 1860.
The principal treaty prior to that of 1855 was made on the 27th of September, 1830; and in order to understand the claim made by the petition, it is necessary that we should refer, also, to some of the more substantial provisions of that treaty, because on that, as an alternative, is based the right to recover.
In the fourteenth article of said treaty it is provided:
“Each Choctaw head of a family being desirous to remain and become a citizen of the States shall be permitted to do so by signifying his intention to the agent within six mouths from the ratification of this treaty, and he or she shall thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner, shall be entitled to one-half that quantity for each ■unmarried child which is living with him over ten years of age, and a quarter section to such child as may be under ten years of age, to adjoin the location of the parent. If they reside upon said lands, intending to become citizens of the States, for five years after the ratification of this treaty, in that case a grant in fee-simple shall issue. Said reservation shall include the present improvement of the head of the family, or a portion of it. Persons who claim under this article shall not lose the privilege of a Choctaw citizen, but, if they ever remove, are not to be entitled to any portion of the Choctaw annuity.”
It is insisted that under this and other provisions of the treaty of 1830, with what followed in the conduct of the Government, and the dealings of the parties, there is a justification in law and in fact for all that was allowed the claimant by the Senate award of the 9th .of March, 1859, and that said amount should be increased because of mistakes made against the Choctaws.
Under the act giving this court jurisdiction, the counsel for the petitioner deemed it prudent to so allege its cause of action, that while the claimant insisted ujion the binding force and legal efficacy of the award of the Senate, if remitted to its original rights there could be a recovery under the legal claims *81 of the Indians as they existed under the law and treaties prior to the making' of the treaty of June, 1855.
In accordance with that theory of the petitioner’s rights, it is alleged “that, if your petitioner, by electing to bring this suit under the above-named act of Congress, ought in equity to be held to have waived the finality and conclusiveness of the award of the Senate herein named (which petitioner expressly denies), yet your petitioner has not, “by bringing this suit under said act or otherwise, waived the right aforesaid secured by said covenant, in Article XI, to demand that this court shall in this action, and as substituted in place of the Senate, adjust and by its decree secure to your petitioner the payment of the said claims and demands, taking into consideration all rights and equities growing out of all the dealings of the United States, as in this petition set forth, with said Choctaw Nation and the individuals thereof.”
It is alleged that in pursuance of the rights guaranteed to individual Indians under the fourteenth section of the treaty of 1830,1,585 heads of Choctaw families signified their intention to remain on their lands in Mississippi and become citizens of the United States, and, although that number substantially complied with all the terms and requirements of said article, and became entitled to a grant in fee, as specified in said treaty, yet but L43 actually received from the United States lands as provided by the provisions of said fourteenth section.
It is further alleged that the lauds to which heads of Choctaw families were entitled, but which by the wrong of the defendants they did not receive, were sold by the United States, and were reasonably7 worth at the time of the sale the sum of |5 per acre.
Following these averments of the petition, it is further stated, that having failed to secure to the claimant its rights under the fourteenth article of the treaty of 1830, on the 23d day of August, 1842, an act, was passed by Congress to provide compensation for the loss of the lands under said treaty, by providing for the issue of scrip to those entitled to lands under the treaty of 1830, which scrip so issued the Indians were to receive in full satisfaction for all rights secured to them by the treaty of said date. It is alleged that the agents of the United States, in the execution of the treaty of 1830, disregarded the letter and spirit of the fourteenth article, and re *82 fused to permit the Indians to avail themselves of the benefit of the stipulations of the said article; and also that the rights secured to them under the act of 1842 were disregarded by the defendants in not delivering to them the scrip as provided for by the terms of said act, but that, in consequence of the failure to deliver the same as provided for by the terms of the third section of said act, the same was worthless in their hands, and was, by the wrong of the defendants, sacrificed by them in selling it at a mere nominal value.
Another cause of complaint, as averred by the petition, is a violation of the nineteenth article of the treaty of 1830. Said article is as follows :
" The following reservations are hereby admitted to Col. David Folsom, four sections, of which two shall include his present improvement and two may be located elsewhere on unoccupied,- unimproved lands. To I. Garland, Col. Robert Cole, Tippanaliomer, John Pitchlynn, Charles Juzan, Johokebetubbe, Eaycbahobia, Ofelioma, two sections each, to include their improvements, and to be bounded by sectional lines, and the same may be disposed of and sold, with the consent of the President. And that others not provided for may be provided for there shall be reserved as follows:
“ First. One section to each head of a family, not exceeding-forty in number, who during the present year may have had in actual cultivation, with a dwelling-house thereon, fifty acres or more.
“ Second. Three quarter-sections, after the manner aforesaid, to each head of a family, not exceeding four hundred and sixty, as shall have cultivated thirty acres, and less than fifty, to be bounded by quarter-section lines of survey, and to be contiguous and adjoining.
“ Third. One half-section, as aforesaid, to those who shall have cultivated from twenty to thirty acres, the number not to exceed four .hundred.
“ Fourth. A quarter section, as aforesaid, to such as shall have cultivated from twelve to twenty acres, the number not to exceed three hundred and fifty ; and one-half that quantity to such as shall have cultivated from two to twelve acres, the number also not to exceed three hundred and fifty persons. Each of said class of cases shall be subject to the limitations contained in the first class, and shall be so located as to include that part of the improvement which contains the dwelling-house. If a greater number shall be found to be entitled to reservations under the several classes of this article than is stipulated for under the limitation prescribed, then, and in that case, the chiefs, separately or together, shall de *83 termine the persons who shall be excluded in the respective districts.
*******
“ The several reservations secured under this article may be sold with the consent of the President of the United States, but should any prefer it, or omit to take a reservation for the quantity he may be entitled to, the United States will, on his removing, pay fifty cents an acre, after reaching their new homes, provided that before the first of January next they shall adduce to the agent, or some other authorized person to be appointed, proof of his claim, and the quantity of it.”
It is insisted that the legal effect of this article was to reserve from the grant 458,400 acres of land, that being the amount which the maximum reservation for the different classes of x>ersons enumerated in the article would produce. But it is alleged in the petition that instead of there being an assignment to 1,600, as contemplated by the treaty, there was an assignment to only 731 persons, making in the aggregate 123,680 acres instead of 458,400, as contemplated by the contract of the parties. The claimant insists that the difference between what it was entitled to receive under said article, and what in fact it did receive, is a just and legal claim against the United States.
It is also alleged that of the fifth class of said article, instead of being 350 cultivators, as contemplated by said afticle, there were, in fact, 1,763; that while the aggregate reservation of 458,400 acres was sufficient, yet the classification had the effect,, as construed by the United States, to deprive the nation of the rights which, by the terms, it still held in the reservations, and f or this item it claims the sum of $408,720.
The petition, as another and distinct cause of action, claims interest to the amount of $134,150 under the provisions of the act of March 3, 1845, making appropriation for the expense of the Indian department for the year ending June 30,1846. It is alleged that the United States became and are responsible, under the provisions of said act, and up to the passage of the act of July, 1852, to pay the sum of $305,551 ; that the land to which the reservers mentioned in the act of 1845 were entitled to was 697,000 acres, making an aggregate sum at the computation of the statute of $872,000.
The third cause of action charged in the petition is based upon the proceedings and award, as it is called, of the Senate, *84 under the eleventh and twelfth articles of the treaty of 1855. Iu this count of the petition it is alleged that the Senate, under the eleventh and twelfth articles of said treaty, adopted as a measure of compensation “just, fair, and liberal,” terms as it was empowered and authorized by the express covenant and stipulation of the last-mentioned treaty.
The finding of the'Senate is declared on according to its legal effect; alleging that certain mistakes and inaccuracies have been made which, if corrected, as they should be, in order to conform to the judgment of the Senate, would increase the allowance of the claimant much beyond the amount found by the report of the Secretary of the Interior, without impairing the legal integrity or conclusiveness of the judgment of the Senate.
Connected with the latter allegation, it is charged that the whole amount due the claimant for land sold, computed by the exact direction of the Senate award, is $8,413,418, as the net proceeds, from which deduct the amount of proper charges, $4,117,885, leaving a balance due the nation of $4,295,533. This amount was, as it is alleged, due at the time oí the statement of the account by the Secretary at the time the report was made to Congress, as alleged in .the petition. From that amount a-deduction is allowed of $500,000, paid under the act of March, 1861, .leaving a balance of $3,795,533, on which interest is claimed from the 9th of March, 1859, the date of the Senate award; and the further sum of $250,000 still due iu bonds. The twenty-seventh specification of the petition alleges that there is now due the claimant the said sum of $3,795,533, with interest at 5 per cent., as the unpaid balance on the proper result as calculated by the award of the Senate.
The twenty-eighth specification alleges that by the undertaking of the United States, as expressed in the fifteenth article of the treaty of 1855, there was guaranteed to the Choctaw Nation the protection of the United States against domestic strife, invasion, and aggression; but that, in consequence of the inability of the United States to protect .them, they became subjected to the jurisdiction aud control of the so-called Confederacy, but that the United States in 1866 reaffirmed its treaty obligations to them.
It is claimed iu the twenty ninth specification of the petition that from July 1, 1861, to July 1, 1866, there became due and *85 payable to the claimant under various treaty stipulations made before July 1,1861, the sum of $406,-84.93, of which amount it is admitted the defendants have paid the sum of $346,835.61, leaving a balance due of $59,449.32, which sum, as it is alleged, the petitioner is entitled to recover, with the other amount demanded in the petition.
The petition in the conclusion of the formal and specific allegations states three accounts between the parties, founded upon different theories of the claimant. First, the award of the Senate, as the amount was determined and reported, with such liabilities as have originated since the date of the finding; second, the award of the Senate corrected from such errors and inaccuracies as it is alleged were made in ascertaining the amount due the claimant; and, third,'the amount due the claimant in case the court ignores and disregards the award of the Senate, and the parties are remitted to such general rights as they may have prior to the treaty of 1855, and such other liabilities as may have accrued since that time, unaffected by the action of the Senate under the articles of said treaty, and, finally, that the United States be declared a trustee holding the lands ceded to them by the treaty of 1830 in trust for the Choctaw Indians, and that an account be stated between the parties upon that theory of the relation between them.
It is also alleged as a distinct claim against the United States, that in the establishment of the boundary between the lands of the claimant and the defendants, to wit, the eastern boundary of the Choctaw Nation and the western line of the State of Arkansas, the line was erroneously surveyed by the agents of the United States, and that in consequence of the error in said line the said claimant lost to its territory a large amount, to wit, 136,204.02 acres. And for that appropriation of the land aforesaid the claimant demands in this proceeding the sum of $167,896.57. Other small claims are made by the petition which it is not material to notice in this connection.
To the case made by the petition, the defendants have pleaded a general plea, denying all liability for any and all causes of action, and a special plea alleging a release as to a portion of the claims embraced in this proceeding.
As we enter upon the investigation of this cause, we are confronted by the inquiry: What is the spirit of the law in which we shall adjudge the rights, duties, and obligations of the parties? ,
*86 It is insisted by tbe claimant, that in passing upon any and all questions embraced in this record, we mast regard the defendants as occupying toward the claimant the delicate and responsible relation of guardian or trustee; and notwithstanding the claimant has the capacity to treat with the defendants, it is yet entitled to the consideration and protection incident to the relation of a ward of the Government.
If it be true that the same rules of law prevail, as in the determination of the trust and responsibility of guardian, in the ordinary relations of life, a much more stringent liability would arise against the defendants than if they were recognized as mere contracting parties, having no greater obligation than such as originated from the terms of their treaty or agreement. In reply to this theory, it is contended by the Government that the claimant comes into this court, in the character of an ordinary suitor, having against it all the technical requirements of its situation as an ordinary litigant.
Not only is the general law of the case a matter of very serious contention, but the statute giving this court jurisdiction is the subject of diverse and radically different construction. It is sought to be maintained by the petitioner that the action of the Senate, made in the submission of the treaty of 1855, has all the qualities of a connnou-law award, and is binding on the defendants and this court; unless from the evidence it is shown that a mistake has been made in calculating the results of the judgment of the Senate, or a fraud has been committed against the rights of the Uuited States by the act of the Senate; that the abrogation of the decision of a competent tribunal is an act involving judicial power; and if the law conferring jurisdiction was intended to have the effect of annulling the adjudication of the Senate, it would be the exercise of judicial functions on the part of the legislature, which would be in violation of the Constitution.
Against this theory of the law, as deduced by the claimant’s construction of the act of 1881, it is argued by the Assistant Attorney-General that by that act the award of the Senate is annulled and removed from all consideration by this court; that it is worthless for every purpose of adjudication; that the field of dispute is now open as though the Senate had taken no action in the premises; and that the legal effect of the act of 188L is to remit the parties to whatever rights they had up *87 to and before the making of the treaty of 1855. These two. contentious embrace the utmost limit of favorable construction dictated to each side by the highest and brpadest interest of either party. (
The court is unable to agree with either extreme, and must, from the legal necessities of this case, assume an intermediate ground as the best theory, although such intermediate position may result in giving to one party the substantial advantages claimed by such party.
The legal effect of the award was made the subject of interpretation in this court at the December term, 1883, in the decision of a demurrer interposed by the defendants to the petition at that term.
The court, in disposing of the demurrer, in relation to the award of the Senate, said (19 C. Cls. R., 243):
“By agreement of the parties contained in the treaty this adjudication and decision was made final, and so was and is conclusive, unless the finality and conclusiveness have been set aside by the concurrence of both parties, since neither party alone could disturb it.
“ In our opinion that has been done for the purposes of the present case. On one side Congress, representing the United States, passed the act of March 3. 1881, giving this court jurisdiction to try all questions of difference arising out of treaty stipulations with the Choctaw Nation. * * * On the other side, the claimant, by coming into court, submitting to its jurisdiction thus conferred, and filing a petition, has assented to the terms of the act throughout. The adjudication and decision of the Senate is, therefore, by the subsequent acts and agreements of the parties, not to be taken as final and conclusive in the trial of this case.
“ It does not follow, however, that the action of the Senate will be wholly without force or effect under any circumstances of the case, that it cannot be given in evidence for any purpose, and that all reference to it in the petition must be disregarded and ruled out on demurrer. The act does not so provide. The jurisdiction conferred is general to try all questions of differences arising out of the treaty stipulations. Power is there granted to the court to review the entire question of differences de novo. One of the questions of difference may be whether the decision of the Senate was warranted by the facts. To review that question we must have the action of the Senate before us. * * *
“Either party may put in evidence that adjudication, and if not controverted it may present the principles, as far as it goes, upon which our Anal decision will rest; but if controverted, *88 we shall consider whatever facts and arguments may be offered in relation thereto.”
It will be seen that the court upon the preliminary question purposely refrained from deciding the exact legal force and effect of the award, reserving that question to the ultimate decision of the cause; but sufficient is indicated in the opinion to define and develop the relation of the action of the Senate to the present proceeding.
The effect of the act of 1881 was to remove from the jurisdiction and consideration of this court, as toward the adjudication of the Senate, the technical law of estoppel, and yet to preserve within the jurisdiction the decision of the Senate to be considered by the court as it might determine.
The language of the law is: “Power is hereby granted to said court to review the entire question of differences de novo, and it shall not be estopped by any action had or award made by the Senate of the United States in pursuance of the treaty of 1855.” 1
While we have duly considered the very able arguments made and briefs filed by counsel for the claimant, and have examined all the authorities cited by them to sustain the decision of the Senate in the legal sanctity of a common-law award; and while we find as facts that (finding xxxvii) the consideration of the Senate “was full, fair, and impartial; and that its adjudication as made under said article was not influenced or affected by, and was in no way or degree the result of, any fraud, corruption, or partiality; and there is no evidence tending to show that it was the result of surprise or mistake on the part of the Senate or any member thereof,” we must hold that under the peculiar provisions of the act giving us jurisdiction, as we have held in substance on the demurrer, that the sanctity of the adjudication of the Senate has been destroyed by the law of our jurisdiction; and that the parties are remitted to their legal rights, as they exist unaffected by the action of the Senate. It is not necessary to discuss and determine the legal effect of the adjudication of the Senate in the abstract; the fact that the petitioner comes into this court affects its claim under the award with all the provisions of the act of the 3d of March, 1881, without which it would have no standing in court; and as to our powers and authority said act is the paramount law of this case.
*89 In the adjudication of this most extraordinary controversy we are not acting as an arbitration or commission, but as a court, having no policy to subserve, and no power to exercise beyond the domain marked by the letter and spirit of the law.
The court, upon the question of the award in the decision of • the demurrer, said:
“ Either party may put in evidence that adjudication, and if not controverted it may present the principles, as far as it goes, upon which our final decision will rest; but if controverted we shall consider whatever facts and arguments may be offered in relation thereto.”
There is no claim upon the part of the Government that the Senate made a mistake in fact, on the theory which it assumed; nor is it pretended that any motive other than the highest consideration of justice actuated that distinguished body in arriving at the conclusion it did, as shown by the findings; but that the legal rights of the parties were misapprehended by the action of the Senate, and that in the exercise of its power under the treaty of 1855 it assumed functions of policy unauthorized by the rule of law which was to govern its adjudication by the submission under that treaty.
It would have been a strange and melancholy reflection on our political condition if any other position than that of the most respectful consideration of the purity and integrity of the Senate had been taken by the law officer of the Government, or shown by the findings of this court. No effort was made to attack the award upon any other ground than that it applied principles of political policy rather than rules of judicial justice in the decision of the controversy as required by the nature and character of the submission.
But, in legal contemplation, the same Senate which made the award in favor of the claimant, and on which is predicated to a large extent the present action, in conjunction with the more popular branch of the Government, has legislated for this court in the act of 1881 by providing—
“That the Court of Claims is hereby authorized to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the Choctaw Nation, and render judgment therein. Power is hereby granted to said court to review the entire question of difference de novo; and it shall not be es-topped by any action had or award made by the Senate of the United States in pursuance of the treaty of 1855.”
*90 In view of the language of the act of 1881, in defining the powers of this court with reference to the action of the Senate, the most that can be said in favor of the award is, that it may be considered by Ihe court subject to such objections to it as may arise either from the facts found by the court or the law of the case, and that such facts and law are not affected to the prejudice of the defendants by the award.
It is iusisted by counsel for the claimant that the “decision of the Senate cannot be disregarded by the court unless it is proved to have been the offspring of fraud, corruption, or flagrant partiality;” and many authorities, both of cases and distinguished authors, are cited in support of that proposition. We have not found any of the facts cited in the position of counsel against the award of the Senate; and in the absence of the peculiar provisions of the act of our jurisdiction we would yield a most cordial assent to the soundness of the proposition asserted by counsel.
It is true that the treaty of 1855, by the twelfth article, provides “it being expressly understood that the adjudication and decision of the Senate shall be final”; but the act of 1881, which the claimant lias acknowledged by bringing this suit, provides in effect that the decision of the Senate may be disregarded by this court, and all questions of differences arising out of treaty stipulations may be inquired into de novo.
By the act of the claimant in coming into this jurisdiction, under the law of 1881, the finality of the award under the treaty of 1855 became subordinated to the jurisdiction of this court, and opened the field of controversy anterior to the action of the Senate. This court, with reference to the award, is not sitting as a court of appellate jurisdiction, to pass simply upon technical and common-law objections to the decision of the Senate, but as a court of unlimited jurisdiction over all questions of difference between the parties growing out of treaty stipulations.
Having determined the question of the legal character of the result of the adjudication of the Senate, it becomes material to inquire into the spirit of the law in which shall be adjudged and determined the rights of the parties independent of the action of that body.
In the eleventh article of the treaty of 1855, in speaking ©f the Indians and the disposition of the United States towards *91 them, it is provided “that their rights and claims against the United States shall receive a just, fair, and liberal consideration,” and while in this proceeding we do not disregard the ■equitable claims of the Indians in so far as they are supported by the law and reasonable inference, we have not been able to construe that provision of the treaty into the broad claim of right asserted by the contention of the claimant.
The words “ claim” and “rights,” as used in the treaty, must necessarily mean to us such claim and such rights as are dependent upon a liberal construction of the Indians’ claim, founded upon law, aside from any pwlicy which other Departments of the Government might have the power to exercise towards the claimant. We are not left to the broad field of natural justice,” exercising a jurisdiction of discretion above and beyond the limit of legal right. One of the provisions of the treaty of 1830 is—
“And further, it is agreed that in the construction of this treaty, whenever well-founded doubt shall arise, it shall be construed most favorably toward the Choctaws.” (Article 18, 7 Stat. L., 338.)
This exact form of expression is not found in the, treaty of 1855, but its spirit is contained in the words, “just, fair, and liberal.”
Justice and fairness are piresupposed in all judicial prroceed-ings, as thence proceeds the sanctity of all law and the binding force of all judgments. Without them the sessions of courts would be a legal mockery. The word “ liberal” cannot enlarge the jurisdiction of this court in the recognition of claims unsupported by legal right, and the only efficacy which can be given to it is in the application of the spirit of the eighteenth article of the treaty of 1830. In the solution of questions of facts involving varied results, and in the construction of treaties, agreements, and statutes, we have endeavored to give to the claimant the benefit of a construction most favorable to it.
The relation which the parties sustain toward each other has been the subject of no little discussion by counsel, as determining the rules of law applicable to a proper decision of the question at issue. It is claimed that this is a suit with a ward on one side and a guardian on the other; and, although this is an action growing out of the provisions of agreements in the form of treaties, in legal essence it partakes of the char *92 acter of a proceeding to enforce a trust and the obligations of a fiduciary relation.
Many cases are cited by counsel for the claimant to sustain the theory that in this proceeding the Choctaw Nation, both in regard to its national rights and as the representative of individual rights, is to be regarded as a ward of the defendants.
In the case of Worcester v. State of Georgia (6 Peters, 652), it is said-
“ The language used in treaties should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than the plain import as connected with the tenor of the treaty, they should be construed as used in the latter sense.

*******

“ How the words of the treaty were understood by this unlettered people rather than in their critical meaning, should form the rule of construction. The question may be asked, Is no distinction to be made between a civilized and savage people ? Are our Indians to be placed upon a footing with, the nations of Europe with whom we have made treaties?
“ The inquiry is not what station shall be given to the Indian tribes in this country, but what relation have they sustained to us since the commencement of our Government ? • We have made treaties with them, and are those treaties to be disregarded on our part because they were entered into with an uncivilized people ? Does this lessen the obligation of such treaties ? By entering into them have we not admitted the power of this people to bind themselves and impose obligations on us ?”
So, in 5 Wallace, 737:
“ Buies of interpretation favorable to the Indian tribes are to be adopted in construing our treaties with them. Hence a provision in an Indian treaty which exempts their lands from ‘levy, sale, and forfeiture’ is not, in the absence of an expression so to limit it, to be confined to a levy and sale under ordinary judicial proceedings only, but it is to be extended to levy and sale by county officers for non-payment of taxes.”
By an examination of the reports of the Supreme Court from its earliest decisions to the present time, the opinions in those two cases, the first by Chief-Justice Marshall and the last by Justice Davis, afford the strongest expression of judicial interpretation in favor of the Indians, and they fall far short of holding that the rules of law as applicable to controversies *93 between guardian and ward are to prevail in suits between tbe United States and the Indian tribes.
The rules to be deduced from the sources of proper and authoritative information in relation to the rig’hts of the parties are that doubts are tobe resolved in favor of the Indians, that they are not to be prejudiced by mere technical construction and that words of doubtful import are to be taken most strongly against the United States. In the light of this law have we adjudged the rights of the claimant, both in the finding of facts and the application of legal principles, in our conclusions of law.
Having determined some of the general principles which are to control in this case, we now consider in detail the various claims made by the petition and contended for, from the evidence, irrespective of the award of the Senate.
The findings are necessarily lengthy, made so by the absolute requirements of the case, and from the very earnest contention of the parties with reference to some points, which without such contention would have been omitted. In finding i the negotiations which resulted in the treaty of 1830 are given, for the reason that the Government insisted that the extent of the claim, as to the number of claimants under the fourteenth article, was much in excess of what they had a right to demand under said article. And so with reference to the negotiation preceding the making of the treaty of 1855 ; those negotiations became material as showing the character and extent of the unsettled claims contemplated by the treaty of 1855. The general rule is, that all antecedent negotiations become merged in the treaty or agreement, but it may be important to show what was contemplated as a subject-matter in making the treaty of 1855.
Passing beyond the award of the Senate, in substance the claims contended for in this proceeding are—
1st. The net proceeds of the sale of the lands ceded by the treaty of .1830, after deducting the expenses incident to the survey and sale of the lands.
2d. Claims of individual Choctaw heads of families, who brought themselves within the requirements of the fourteenth article, but were deprived of their right by the fraud and wrong of the agents of the United States, under the treaty and act of 1842.
*94 3cl. Claimants who failed to receive compensation under the nineteenth article of the treaty of 1830.
4th. Compensation for land appropriated by the United States in the establishment of the boundary between the Choctaw Nation and the State of Arkansas.
5th. Arrearages of annuities.
6th. The bonds which were to have been issued under the act of 1861. (12 St-at. L., 238.)
7th. Interest claim under the act of 1845. (5 Stat. L., 777.)
8th. Subsistence and removal claim under the sixteenth article of the treaty, and compensation for a principal chief' under the fifteenth article.
9th. For guns, ammunition, &c., as provided for in the twentieth article of the treaty of 1830.
We will consider them in the order stated. The net proceeds of the hinds ceded by the treaty of 1830 was the principal claim made by the petitioner at the time it commenced the negotiations preparatory to the treaty" of 1855, and this claim is based upon the character of the title which it held, as it is alleged, in the lands ceded by the treaty of 1830 and the provisions of the eighteenth article of said treaty, which are as follows:
“The United States shall cause the lands hereby ceded to-be surveyed, and surveyors may enter the Choctaw country for that purpose, conducting themselves properly, and interrupting none of the Choctaw people. But no person is to be settled within the Choctaw Nation or the lands sold before the Choctaw removes; and ior the payment of the several amounts, secured in this treaty the lands hereby ceded are to remain a fund pledged for that purpose until the debt shall be provided for and arranged. And further, it is agreed that in the construction of this treaty, wherever well-founded doubt shall arise, it shall be construed most favorably toward the Choctaws.”
By finding i, and the history of the removal of the Choctaw people from the State of Mississippi, it is very clear that the object the United States had in making the treaty of 1830 with the Choctaws was to get possession of that large district of country then owned by the Indians, for the purpose of occupation and settlement by the white people emigrating to the State of Mississippi; and the question of price was immaterial, so that the United States got possession of the country and. *95 secured to the Indians what it wras believed would be a better location for them west of the Mississippi. The rights of the parties must be settled, not from the character of the title which the Indians held in the lands under the treaty of 1825,. but from the terms used in the treaty of 1830, because in that, for the time being, became merged the obligation and rights of the parties.
The claim of the net proceeds was insisted upon, more on the ground of equitable right than strict legal requirement, at the time the treaty of 1855 was made, and if it can be sustained by the canon of construction recognized by the treaty of 1830, the claimant should recover upon that theory in this proceeding.
The latter part of the eighteenth article provides:
“And for the payment of the several amounts secured in this treaty the lands hereby ceded are to remain a fund pledged for that purpose until the debt shall be provided for and arranged.”
It is insisted that a proper construction of this clause of the treaty is, that the debt mentioned is the sum due from the United States of the proceeds of the lands, after the deduction of such expenses as may have been incident to the survey and sale of the lands. That the legal effect of the treaty of 1830 was to create the United States a trustee of the proceeds of the land, entitled to no other deductions than such expenses as may have been incurred in the execution of the trust, and such payments as have been made to the nation of the proceeds of the trust property.
We have already held that the legal relation of trustee and cestui que trust did not as a matter of law exist between the parties; and unless the terms of the treatv of 1830 established that relation with reference to the subject-matter of this claim, the petitioner must be held in this court as bound by the same rules of law as are incident to other litigants, subject to the exceptions heretofore suggested.
In the exercise of the most liberal rules of construction and interpretation, we can find no authority in any article of the treaty of 1830 forgiving to the claimant the net proceeds of the land ceded to the United States by that treaty; and while such a right, in all fairness, might have been provided for, we can recognize only those actually secured by the provisions of the treaty. The term “ debt,” as used in the eighteenth article, is *96 an embodiment of the several amounts specifically secured in the treaty.
Much discussion was had in the trial of this cause as to the proper construction of the treaty in relation to the claim of the petitioner under the fourteenth article of the treaty of 1830, the United States contending that the extent of the claimant as to number under that article, as shown by the findings, was a perversion of the purposes of the treaty, which purpose was to get possession of the territory and extinguish the substantial settlement of the Choctaw Nation as a people in the State of Mississippi. We hold that by the general provisions of the fourteenth article every Choctaw family that complied with the requirement of said article had the right to select and appropriate under said article; and that such right did not depend upon the number applying, but upon the question whether each applicant had the qualification prescribed by the treaty, and whether, within the time limited by law, such applicant complied with the prescribed conditions of the fourteenth article in such manner as was best calculated to enforce that right, on the part of the Indian, consistent with a reasonable protection to the United States against fraud and imposition.
We will now consider briefly the facts connected with the claim of the petitioner because of an alleged disregard of the fourteenth article of the treaty of 1830. Said treaty was made on the 27th of September, 1830, and ratified by the United States on the 24th of February, 1831; so that the limitation of six months within which claims were to be filed expired on the 24th of August.
On May 21, 1831, the War Department (finding ii) gave instructions to the Indian agent in the State of Mississippi as to registration under said article. The tenth finding shows the manner in which the agent discharged the duty of the position, which was to make selections, for heads of families, under the fourteenth article, under such reasonable rules and regulations as might protect the interest of both parties.
It is very clear that the purpose of the agent was to discourage the selections of lauds under said article, and the policy of Indian emigration, which was the great object of the treaty on the part of the United States, was maintained by^the agent of the Government in the manner in which he executed the treaty, in the matter of the fourteenth article.
*97 The agent’s office was not opened for business until the latter part of June, 1831, and when it was, his conduct was a practical disregard of the rights of the Indians. The six months closed on the 24th of August, in which by the terms of the law the parties were compelled to make their selections; and during that time sixty-nine heads of families had complied with the requirements of the treaty, as shown by the registration returned to the War Department. If the law .had been faithfully executed we have no doubt a much larger number than that would have brought themselves within the requirements of the provisions of the treaty.
In June, 1833 (finding v), Mr. Martin was appointed to make selections of the lands granted under the fourteenth, fifteenth, and nineteenth articles, who was directed to be governed in his selections, as to the fourteenth article, by the registry returned by the former agent.
The locating agent soon discovered that a wrong had been perpetrated by the selecting- agent, and the result was that, upon the suggestion of the fact to the Department, a register of the claims of persons who had been deprived of their rights in the registration was made; and in December 1834, the same was transmitted to the Secretary of War, showing a list of five hundred and eighty persons who had made, or attempted to make, selections, but were not permitted to do so by the selecting agent. (Finding vii.)
The report of Mr. Martin brought to the attention of the Government at Washington the mode in whicli the treaty had been executed with reference to the reservees under the fourteenth article, and upon the basis of that information was passed the act of 1837 (5 Stat. L., 180) and the act of 1838.
It is not necessary to state in detail the conduct of the agent Ward, as shown by the findings; it is sufficient to say that it was a practical disregard of the rights of a large body of the Indians, who, as the heads of families, sought to communicate to the Government their selection of lauds under the fourteenth article, which, by the history of its adoption, is shown to have been a substantial provision of the treaty, in favor of the individual members of the Choctaw Nation.
In pursuance to the act of 1837, Messrs. Vroom, Pray, and Murry were appointed commissioners (finding ix), and were instructed by the Department at length on the subieet of their *98 duties. It will be seen by the ninth finding that the commission appointed under the acts of 1837 and 1838 afforded every facility to the Indians to establish the fact that they had made, or attempted to make, known to the officers of the Government their intention to remain, pursuant to their right under the treaty; and if it is said that the first agent employed by the United States was hostile to the rights of the Indians, it must be said of the commissioners under the acts of 1837 and 1838, consistent with a faithful discharge of their duty, they had toward the Indians the kindest feelings.
The number of claimants before the board was 1,349; that number included 201 particularly reported, while other claims were to be filed at the time of the adjournment of the board. The commission reported on 201 cases; 105 approved, 05 rejected, 20 recommended to the favorable consideration of Congress, and 5 unfinished. (Finding x.)
Following the * ommission of 1837 came the commission under the act of 1842. (5 Stat. L., 513.)
The commission appointed under said act was instructed in its duties on the 24th of October, 1842, as will be seen by reference to fiudiug xi. Said act was intended to pursue and more fully execute the policy adopted by the acts of 1837 and •1838, as to claimants under the fourteenth article; and by its provisions it embraced claims under the nineteenth article of the treaty.
An examination of the findings in reference to the commissioners under the act of 1842 will show that, like the commission under the former acts, they- had, consistent with the legal interest- of the United States, a disposition to deal with the claimants in the broadest spirit of liberality and fairness. They served no policy, save the examination of claims according to rules best calculated to ascertain the truth.
For some reason no claim was made as to reservees under the nineteenth article, and their examination was confined exclusively to claims under the fourteenth article. They were particularly instructed as to their duty, and every facility was afforded to them to make a full, thorough, and impartial investigation, through and by the best means of ascertaining the truth.
On June 16, 1845, the commission under the act of 1842 reported “that all the Choctaw claims arising under the four *99 teenth article of the treaty presented in correct form had been fully determined; some few cases not adjusted for wantof legal requisites.” (Finding xii.)
Finding xiii shows that the whole number of heads of families making application for and receiving land was 143, by the registration of Ward, ns amended by the addition of other names and the report i f commissioners appointed under the act of 1842. The number who successfully established their right- and who did not receive land out of the reservation was 1,150;: the number who failed was 292; making in the aggregate 1,585-' claimants.
The examination before the different commissions was in the form of a judicial investigation, the attorney of the United States often appearing, and the cl-imants represented by agents arid cou sel presumed to be competent to defend every interest and to protect every right of the applicant.
It is insisted that the act of 1842 imposes conditions not required by the treaty, and many authorities an- cited to prove that it is not within the power of Congress to abridge or restrict a right to enjoy property guaranteed or secured under treaty stipulations. We will cousider that point in another connection.
As incident- to the result of the act of 1842, Congress passed the act of the 3d of March, 1845 (5 Stat. L., 777), providing that one-half of the scrip should not be delivered, but that the same should be funded at $1.25 an acre, to bear interest at 5 per cent.; and again, on the 21st of July, 1852, passed an act (10 Stat. L., 19) providing for the payment of the amount funded by the act of 1845 upon the condition “ that the final payment and satisfaction of said award shall be first ratified and approved as a final release of all claims of such parties under the fourteenth article of said treaty by the proper national authority of the Choctaws in such form as shall be prescribed by the Secretary of the Interior.”
Under the provisions of the act of July 21, 1852, the Choctaw Nation received the sum of $872,000, being the amount of the land funded under the act of 1845, and executed by its proper authority the instrument set forth in the findings. To the special plea of the Government, counting upon said instrument as a release, the claimant filed a lengthy replication, the substance of which is, that the release was not the voluntary *100 act of the Choctaw Nation nor of the heads of the families entitled to reservations under the fourteenth article of the ¿treaty of 1830; that both before and after the law of 1852, and tt'he execution of the release under it, the nation and the individuals affected by the wrong incident to the execution of the fourteenth article had asserted a claim to a compensation because of the violation of the rights of the Indians under said .article.
Considered as a mere pleading, it legally asserts that the -.matters set forth in the special plea are no bar, because in law .they were not the voluntary acts of the claimant.
The replieation does not assume to fulfill the requirements in every particular of a replication of duress, as required at common law; but interposes, as it is churned against the plea, .such general allegation of fact as in this case, because of its legal peculiarities, destroys the legal effect of the plea.
Having stated briefly as possible the leading facts of the .record bearing upon the individual claims under the fourteenth article, it remains for us by the application of what we regard .as legal principles to determine the claim of the petitioner upon that branch of the case. If the rights of the parties and those whose claims were allowed existed in fact and law, as they did upon the expiration of the agency of Ward; if the individuals had disregarded the propositions of adjustment contained in the several acts passed by Congress to ascertain the extent of their rights; if no interest had been accepted; if no money had been received in payment of a perpetual annuity,' which was the result of the fund arising from the proceeds of the lands accruing under the treaty of 1830, the situation of the case would in law be radically different; and the question is, can we disregard what has been done by the parties since the close of the six months’ limitation under the treaty, allow what the heads of families would be entitled to, according to its then value, deducting what has been paid by the defendants?
. If this were a proceeding between parties having nothing but the rights of individuals in a court of common-law jurisdiction, there would be no serious questions for solution; but it is argued that the peculiar relations of the parties create new and greater obligations; and upon that theory the replication to the special plea is framed, without the ordinary requirement of the allegation of such facts as would constitute legal duress. *101 We have already indicated the general principles of law with? reference to the parties, that they are in this jurisdiction as-ordinary litigants, with rules of interpretation and construct!oe-in favor of the claimant.
There is nothing in the record to show what agency, if anyr the Choctaw Nation ha-1 in the passage of the different laws;from 1837 to 1852; but it does appear that, through agents andl attorneys, parties accepted such recognition of alleged rights: as Congress saw fit to give them in the various laws passed! upon the subject-matter of their claims under the treaty of 1830o. As has been said, the character of the investigation, under*the various acts, was similar to a judicial investigation, each» claimant appearing not in the weakness of his ignorance but? represented by agents and counsel, competent to defend every right incident to the applicant under the laws of the United' States. The findings show that under the act of 1842 the com*mission remained in session long enough to dispose of the business contemplated by the purpose of the act and those who-applied under the act of 1842, and successfully sustained tlieir-claim, either got the land they were entitled to or receive® scrip in lieu of such reservations, and participated in the fun® of the act of 1845.
But it is insisted that the legal effect of the proceedings under the act of 1842 and the release executed on the 6th day of November, 1852, have been annulled by the provisions of the treaty of 1855.
There is no express waiver in said treaty of the proceedings under the act of July, 1852, and the provisions of that tieaty proposing a settlement by the arbitration of the Senate does not necessarily destroy the legal effect of any act of the parties,,, and the only thing which in our inquiry as it mav be de now that is affected by direct law is the award of the Senate.
It is said that a defense under the release is repugnant to-the provisions of the treaty of 1855, because such a defense-would be abhorrent to the spirit of fairness and liberality expressed by the terms of the eleventh article Jfcf the treaty of 1855.
We have already discussed at some length the judicial force of these words in the present suit, and it is unnecessary to enlarge upon what we have in another connection said upon that subject. The recognition of the legal effect of what the claim- *102 anfc did under the act of July, 1852, does not violate the justice, fairness, and liberality of the treaty of 1855, unless the parties intended to supersede the legal effect of that act.
The release under the act of 1852 was executed by the proper authorities of tiie Choctaw Nation, and the findings do not show that in accepting the payment of the $872,000 such authorities in any way were induced to accept the same by any misrepresentation or illegal procurement of the defendants. It may have been that the necessities of the nation made it almost imperative that the appropriation of the defendants should be accepted; but the condition and necessities of the parties have never been held sufficient in law lo auuul and abrogate their agreements. (French v. Shoemaker, 14 Wall, 314.) The payment of the $872,000 was to be made on the condition that the nation execute a release for claims under the fourteenth article, those claims being the original consideration of the agreement to pay in the form of an annuity, and if the nation did not tiesirt the payment of the annuity itself, it should have refused to accept the same on the conditions provided for by the act of 1852.
The same 'authority that made the treaty ot' 1830, and all other treaties commencing in 1782, and which, under the provisions of the act of 1881 brings this suit, executed and delivered through its legally-constituted authorities the release of November 0, 1852; and if that instrument, with what preceded it in the history of the parlies thereto in relation to the same subject-matter, is to be disregarded it must be so announced by a distinct act of legislation. It is not for courts to discuss and determine questions of policy; they have none, and the best and highest function they perform is to apply the law as it may exist.
If, by reasonable intendment, we could assume that the treaty of 1855 destroyed in law the legal effect of what the parties did under the various acts of Congress we would not hesitate to open the whole question of the liability of the Government, because of the manner of the execution of that portion of the treaty of 1830 which provided for individual Indians; and were it not for the effect in law of what the parties did in relation to grievances of that character the result of this cause might be very different.
In this proceeding the claimant asserts no other rights than *103 those dependent upon contract relations, and if any other were asserted the theory of such claim would be in direct conflict with the letter of onr jurisdiction, because we are restricted to questions of differences arising out of “treaty stipulations.” We must consider the legal status of the parties as we find it by the force and effect of what they did. The acceptance of the annuity under the act of July 21, 1852, and the execution of the instrument set forth in the twenty-third finding are the acts of the constituted authorities of the Choctaw Nation, and we find no warrant in anything said in the treaty of 1855 or in the law of our jurisdiction to justify us in disregarding the legal effect of that instrument.
Under the act of 1842 there was issued to the 1,150 families whose claims were favorably reported by the commission scrip aggregating 700,000 acres of land, which was, as it is alleged, sacrificed by the Indians because the same was not delivered to them at a place where it could be used, and that in consequence of the inode of delivery the reservees realized only the sum of $118,400, which, being added to the $872,000 funded under the act of 1845, made the amount received $980,400. It is insisted by the claimant that in consequence of t he refusal of the Government to deliver the scrip in the State of Mississippi the reservees were deprived of benefits of an opportunity to sell the same, and were compelled to dispose of it at a nominal price.
The statute of 1S42 provided that the scrip should be delivered under the direction of the Secretary of War, through such agent as he might .select, not more than one-half of the scrip to be delivered until the removal of the Indian to the Choctaw territory west of the Mississippi River.
The Secretary of War declined to issue any portion of the scrip until the removal of the reservee, aud because of such refusal the claimant alleges that the interest of the Indian was sacrificed — the scrip becoming comparatively worthless. The findings do not show that at the place where the scrip might have been delivered there was a market differing in any substantial particular from the Choctaw country- This demand being connected with the fourteenth article claim, according to the effect given to the statute of 1852 and the release executed by the claimant, became merged in the adjustment rep *104 resented ‘by tbe instrument executed on the 6th of November, 3852.
Many rights of the Indians can be considered under the treaty of 1855 by giving to the release of November, 1852, the full force claimed for it by the Government, and its recognition does not defeat the purpose of the treaty.
The Supreme Court has held that the United States by subjecting themselves to the jurisdiction of this court became subject to the same rules of responsibility as incident to an individual, and it may be said that they are entitled to the corresponding barriers of protection. (The Floyd Acceptances, 7 Wall., 666.)
But while we concede to the release the legal effect of discharging the liability of tbe Government as to a class of claimants under the fourteenth article we are not disposed to extend it by implication or construction. The Government is entitled to rights under it only in so far, as by its letter and purpose, it bars the claims of the Indians. The fund provided by the act of 1845 represented the individual claimants who had successfully maintained their rights to reservations before the commission provided by the act of 1842. Those whose claims were rejected never became recipients of the fund provided by the annuity of 1845; and in dealing with that fund, after its creation, the Choctaw Nation represented only the 1,150 families whose reservations became a part of the $872,000; the legal effect of the act of July 21, 1852, and the release executed in pursuance to its provisions, was to settle claims and rights incident to those who were represented in that fund. The act recites that “the Secretary of the Interior be, and he is hereby, directed to pay said claimants the amount of principal awarded in each case, respectively;” and the release concludes, “as a final release of the claim of such parties.”
The thirteenth finding shows that the commissioners appointed under the act of 1842 rejected two hundred and ninety-two claims, and it is insisted that these rejections were in consequence of the condition imposed by the third section of the act of 1842, in requiring the claimant to show that on the 27th of September, 1830, he had an improvement “in the then Choctaw country, and that having and owning an improvement at the place and time aforesaid, did reside on the identical improvement or a part of it for the term of five years continuously.’7 *105 One of the questions of fact connected with the adjustment of the findings was to determine from the evidence the probable number who were rejected by the board in consequence of the conditions prescribed by the act of 1842. We have, as is shown in the latter part of finding xiii, determined that the heads of families rejected by the conditions of the act of 1842 would aggregate 225,700 acres.
The fourteenth section of the treaty of 1830 gave to each Choctaw head of a family the right to a reservation upon complying with certain conditions; upon such compliance his right to a reservation was complete, and we do not find among those conditions the obligation of having an improvement on the selected reservation .before the 27th day of September, 1830.
That portion of the treaty which was simply directory as to the mode in which the location of the reservation might be made, with reference to the improvement became, by the requirement of the act of 1842, a condition precedent to the right of reservation, and imposed upon the Indian obligations beyond the requirement of the treaty.
The authorities are many that the terms of a treaty cannot be changed or affected by the act of one party to the prejudice of the other; and unless the fact that the Indians whose applications were rejected by the board consented to the imposition of new conditions they have a present right to insist through the claimant upon the letter of the treaty. (Mitchell et al. v. United States, 9 Pet., 711, 749, 755; United States v. Brooks, 10 Howard, 460; Crews v. Burcham, 1 Black, 356; Eastern Band of Cherokees, 20 C. Cls. R., 449.)
The facts do not show that, as to the rejected claimants, the nation recognized in any way in its capacity as a nation the proceedings under the act of 1842, and it was only by the individual acts of the Indians that an investigation was made before either commission.
It is iusisted that by the presentation of claims under the act of 1842, even though it did impose conditions not authorized or required by the treaty, the rights of the rejected reservees became forfeited, and that they are estopped by the finding of the board.
The law does not favor estoppels, forfeitures, and penalties, and will not recognize or enforce them unless in clear and uu- *106 questionable cases. Estoppels are not favored defenses when the technicality cannot be subordinated to its equity. (Andrews v. Lyons, 11 Allen, 349; Lousenburg v. Depew, 28 Barbour, 44; Waters, appealed, 35 Pa. St., 523; Babcock v. Pary, 8 Ohio St., 270; State v. Pepper, 31 Ind., 78.)
The parties to the treaty of 1830 are so different in their character that what may be expected of one in the protection and recognition of its rights may not be demanded of the other. The commission of 1842 was the only way the Indian could reach the Government for a recognition of his rights as a reservee, aud he had to take such terms as to the mode of his appeal as was given to him for the time being.
The board decided as to persons not having au improvement and residence according to the requirements of the act of 1842; there was no remedy in that act, and the legal effect of such finding was to leave to the Indian such rights as he may have had under the treaty of 1830. The board of 1842 had no right to consider a claim unless it had the superaddod condition of the third section of the law of 1842, so that a party might have had all the qualifications required by the treaty and yet be wbthout remedy within the jurisdiction of the board of 1842. Congress said, by the terms of the law, we will have considered only those cases of Choctaw heads of families who had, at the date of the treaty, an improvement on the reservation, and who continuously resided on the same five years after the 24th of February, 1831.
It is not necessary to discuss any other condition of the act of 1812, for the reason that if it be-true in law, as we have assumed, that the requirement of improvement imposes limitation of rights not authorized by the treaty, aud that a submission under said act did not bind the individual Indian whose claim was rejected, the other conditions become immaterial for the purpose of the argument. The act of 1842 required a continuous residence on the improvement of the reservee for five years from, the 27th of September, 1830, and without that continued residence the board was required to reject the claim. A residence of five years was not a condition precedent to the right of reservation, and only changed the. character of the grant into the highest possible estate which can be held in lands; but before that estate attached to the reservee he had the right of possession and perpetual enjoyment. Besides his *107 very failure to reside may have been the fault of the Government to protect him according' to the requirements of the treaty. Upon the facts, found by the court on this branch of the claim, the reserveés, whose rights were defeated by the provisions of the act of 1842, were entitled to 225,760 acres of land, and at the time their right was worth the sum of $417,650.
We will now consider the claim of the petitioner under the nineteenth article of the treaty of 1830.
By that article certain reservations are made to individuals, eo nomine, and to four distinct classes of persons, the classification of a person depending on the amount of land in cultivation at the time of the treaty.
Although by the act of 1842 the coiflmission had full power to adjudicate the rights of parties under this article, no claims were presented to the commission, and in the absence of such presentation it may be presumed but few existed.
In April, 1831, Major Armstrong was appoiuted by the Department to make adjustment of claims under article 19, and his report will be found in full in the fourth finding. By reference to that report it will be seen that while some of the classes provided for by the treaty were less in number some of the smaller classes were largely in excess of the number provided for by the article.
It is insisted that the legal effect of this provision of the treaty was to reserve from the grant 458,400 acres of land, that being the amount the maximum reservation lor the different classes of persons enumerated in the article would produce. It is alleged that instead of there being an assignment for 1,600, as contemplated by the amount of land reserved, there was in fact an assignment to only 731 persons, making in the aggregate 123,680 acres, instead of 458,400.
The report of Major Armstrong shows that only 731 persons were allowed land under said grant, amounting in the aggregate to 123,680 acres; and the question of law arising on this state of facts is, was it a graut by the defendants or a reservation by the petitioner of so many acres of laud in the aggregate, determined by the highest possible maximum, or does the right simply inure to classes of persons limited in number in each class.
Is it a reservation in quantity, absolutely fixed in extent by *108 the terms of the treaty, or a dedication of a certain amount of land, to a specific class of persons, to be used or enjoyed upon the condition that each class has the maximum specifically designated by the terms of the reservation. If the former, the claim of the petitioner is a legal one; if the latter, then no legal rightattaches, because of thefailnre of the larger class of claims and an excess of the smaller.
The reservations of the nineteenth article are either to a specific individual or a class, and the classes are limited to a specific number, not to exceed that number.
Bach classification was a reservation, to a number of persons, not to exceed a certain number; and in ease there was an excess in number in any given class, then, by the terms of the article, it was made the duty of the chiefs to determine the persons who should be excluded, and no provision is made for a deficiency in any given class.
The parties failed to provide for what claimant now insists on by way of construction — an application of the surplus of a class not having the number to a class having a greater number than provided for by the treaty. Is this not a reservation to persons having a certain qualification not to exceed a certain number, and in no event to be beyohd the actual number belonging to each class'? Are not the class persons limited by the number of their class, as specified in the treaty, as effectually as are specific persons limited by the names of the persons specifically named in the treaty?
The nineteenth article says, “the following reservations are hereby admitted,” and then follows the specific specifications numerically stated. Was it not a grant of land more or less as the measure of its requirement was determined by the number of persons having certain qualifications not to exceed in any event a certain number 1 In the examination of that portion of the treaty providing for these reservations we do not find words of doubtful import or clauses of uncertain construction, and hence we are not permitted to apply the latter clause of the eighteenth article giving the court the right to construe most favorably “ well-founded doubt” in favor of the Choctaws. In the opinion of the court the measure of the petitioner’s claim on this article is determined by persons and not by quantity.
It is insisted by the Government that all claim under this *109 article is barred by the statute, giving the claimants a right to present their grievances, but it is a sufficient reply to that position to say that no claims were presented under said article.
By reference to finding xlii, it will be seen that the agent of the Government decided that 7111 persons became entitled to land, under the cultivation classes, to an aggregate of 158,960 acres, but that 98 of those persons never received any location of lands or compensation therefor; that they were entitled to 15,520 acres ; that 45 other persons relinquished their right to the United States, but received no compensation for such relinquishment, and that such persons were entitled to 6,400 acres ; that one individual was entitled under said article to two sections of land, and that he never received the same.
The aggregate of these reservations is 23,200 acres; as to these claims, there has been no adjudication or settlement, and as the claimant in this proceeding represents both national and individual claims, it is entitled to recover the sum of $42,920 on the item of the claim. We distinguish these claims from those under the fourteenth finding for reasons stated in the opinion in the discussion of that item.
The next matter to be considered in the order named is compensation for land alleged to have been appropriated by the United States in the location of the boundary between the lands of the claimant and those of the defendants.
The first article of the treaty of 1855, fixing more definitely the boundary of the territory ceded by the treaty of 1830, provides as to said boundary as follows :
“Beginning at a point on the Arkansas River one hundred paces east of old Fort Smith where the western boundary line of the State of Kansas crosses said river and running thence due south to Red River; thence up Red River to the point where the meridian of one hundred degrees west longitude crosses the same; thence north along said meridian to the main Canadian River; thence down said river to its junction with the Arkansas River; .thence down said river to the place of beginning.”
It is alleged that the United States, in fixing the boundary between the east line of the land of the claimant and the western line of the State of .Arkansas, did not establish the same according to the requirements of the treaty of 1855; but, upon the contrary, did so establish it as to encroach on the *110 territory of the petitioner; that the amount lost to the claimant by such encroachment is 136,204.02 acres; that by the act of 1875 the said land became a part of the public domain of the United States without the consent of the petitioner, and the claimant demands from the United States, because of such illegal appropriation, the sum of $167,896.57, placing the value of the lands at $1.25 per acre.
It is contended by the United States that this demand, if valid, does not grow out of treaty stipulations, but is founded on the act of 1875, and therefore the court has no jurisdiction to try that difference in this case.
The boundary of the lands of the claimant was fixed by the treaty of 1855, as well as other treaties; such boundary became as to it a claim founded on treaty stipulation, and it had a right to have such lands as were designated as forming a part of the territory ceded to it by treaty protected from the use and appropriation of the United States.
Finding xxxi shows that the Government made a mistake in the location of the. boundary, substantially as alleged in the petition; that of the amount embraced in the territory appro-, priated by the United States because of such mistake 21,211.33 acres have been sold, realizing the sum of $23,930.61; that there have been otherwisedisposed of 35,428.56 acres, leaving 79,564.13 acres still in the possession and ownership of the Government, which is subject to purchase at $1.25 an acre.
From the best evidence before us we have found the value of the lauds to be $68,102. By the act of 1875 (18 Stat. L., 476) the line erroneously surveyed was fixed as the permanent boundary of the State of Arkansas and the Indian country ; by force of the act, land belonging to the claimant was taken for the use and benefit of the defendants; and as the right to the land is based upon treaty stipulation the claim falls within the scope and purpose of this litigation, notwithstanding the earnest contention of the United States that the claim grows out of and is wholly dependent upon the statute of 1875.
The record shows not only an appropriation in fact of a large part of the land, but in law there is an appropriation of the whole by the legal establishment of the boundary as provided for in the statute. Upon that item of the claim the petitioner is entitled to recover the sum of $68,102.
*111 In the twenty-ninth specification of the petition it is alleged that between July 1,1801, and July 1,1866, there became and was due the claimant from the United States, under treaty stipulations made previous to said July 1, 1861, the sum of $406,284.93, and that of said amount the United States had a right to retain the sum of $346,835.61, leaving a balance due of $59,449.32 ; but it was contended by the United States that the said sum of $406,284.93 had been paid for the use and benefit of the claimant during the war to individual members of the Choctaw’ Nation who adhered to the Government and refused to join the Southern Confederacy. The right to pay those adhering is conceded by the claiman tby the allegation of its petition, and the only question of contention is how much has been paid.
By reference to the thirty-fourth finding it will be seen that the court has found the allegations of the petition to be true, both as to the amount accruing to the claimant under treaty stipulations and the amount paid by the defendants, and therefore upon that item the petitioner is entitled to recover the sum of $59,449.32.
We have examined the question carefully upon the question of fact, and the only conclusion that can be consistently reached is the one announced in the finding, and upon that state of fact the right of the claimant is unquestionable.
As a further cause of action it is alleged that by virtue of the provisions of the act of Congress approved March 2, 1861, the petitioner became and was entitled to demand from the Government $259,000 in bonds of the United States, bearing 6 per cent, interest on account of the award of the Senate; that the issue of said bonds was demanded by the proper authorities of the Choctaw Nation and refused by the Government; that the petitioner has not been paid by the defendants because of such bonds; and that petitioner is now entitled to the amount of said bonds at 6 per cent, interest from the date of demand to the present time.
The substantial allegations of fact as made by the petition are shown by the findings, and the question for us to determine is, what are the rights of the claimant upon the law and facts, as applicable to that portiou of the claim. In relation to the subject-matter of this item, three statutes have been enacted: First, the Act of March 2,1861, providing for the issue of bonds *112 (12 Stat. L., 238); second, the Act of March 3, 1871, directing the Secretary of the Treasury to issue the bonds (16 id., 570), and the Act of February 14, 1873, suspending the authority of the Secretary of the Treasury to deliver such bonds until the further action of Congress (17 id., 462).
The right to the bonds in controversy originated by the act of March 2, 1861.
The peculiar condition of the country and the relation of the Choctaw Nation to the threatened revolt against the authority of the United States, which was inaugurated shortly after the passage of that act, may have been the cause of the failure to deliver the bonds under said act; and the unsatisfactory relation between the Choctaw Nation and the United States because of the war permitted the matter to rest until the act of the 3d of March, 1871.
For reasons no doubt satisfactory to the Secretary of the Treasury he failed and refused to deliver the bonds under the last-named act, and in that condition of the rights and interest of the parties the law of 1873 was passed. (17 Stat. L., 462.)
By that statute “ all authority now existing by the acts of March 2,1861, and March 3, 1871, or otherwise, to issue or deliver any bonds of the United States to the Choctaw tribe of Indians is hereby suspended until further action of Congress in the matter and providing for such issue and delivery.”
The right to the bonds contemplated by the acts of 1861 and 1871 is dependent entirely upon those statutes, and while indebtedness might exist from the defendants to the petitioner upon which in this case it may have the right to succeed, if the statutory right to the bonds has been taken away, upon that item of claim as to those bonds the law is with the defendants.
The law of 1873, just quoted, in express terms denies the right of the Secretary to deliver the bonds by suspending his power to do so until the further action of Congress ; and the Secretary being without power to deliver, the petitioner is deprived of the correlative right to demand, and being without the right to demand, the right to recover fails.
The right of the claimant to recover money from the United States is founded upon its claim against them, because of treaty obligations, and a mere proposition to pay upon that obligation, unexecuted and finally suspended or retracted, does not *113 in law increase or diminish tbe liability of tbe defendants. At tbe time tbe act of 1881 was passed, giving tbis court jurisdiction to try all questions of difference founded on treaty stipulations, the statute of 1873 was in full force, and tbe effect of that law was to remit tbe parties to tbe rights they bad as against each other founded on treaties.
It might be that the refusal of the Secretary of the Treasury to deliver the bonds when demanded in April, 1861, gave the claimant the right to proceed by mandamus to compel the issue of the bonds, according to the doctrine announced in the Marbury Case (1 Cranch, 137) or the later case of the United States v. Schurz (U. S. R., 378), but that would be a right founded upon the statute alone, having no reference to the question of treaty stipulations; but the claimant did not see fit to assert any legal right to the bonds until after the statute authorizing their delivery had been repealed. It is true that the petitioner is not seeking in this proceeding to enforce the delivery of bonds, but simply that it may be allowed as if bonds had been issued, when demanded, in April, 1861. We are asked to allow the interest which would have accumulated on $250,000 in bonds bearing date as of the time of the demand in 1861.
The act of 1861 was a mere proposition to pay $500,000 on account, and the demand in April was simply an agreement to receive that amount as proposed; but when the parties fail to consummate the transaction and the proposition to give was withdrawn by the repeal of the law, then the treaty indebtedness was the only subsisting bond of obligation and responsibility. The proposition to pay was founded on the conceded consideration of treaty obligation, and when the proposition ceases by operation of law, the treaty liability was left intact and became the measure of obligation.
The act of 1861 simply authorized the payment of a certain sum in money and the delivery of certain bonds on account of the Choctaw claim under the treaty of 1855, and provided that in the future adjustments of the claim such money and bonds should be charged against the Indians. Upon that branch of the claim the law is with the defendants; and the only effect of the laws of 1861, 1871, and 1873 is.the payment of $250,000, which is to be deducted from what may be found due the claimant upon the different branches of its claims.
The petitioner, as another and distinct cause of action, claims *114 interest to the amount of $134,150, under the provisions of the act of March 3, 1845, making appropriation for the expense of the Indian department for the year ending June 30, 1846.
It is alleged that under the arrangement made for funding one-half of the scrip provided for under the act of 1842, there accrued to the claimant the sum of $305,551, and that only $171,400.34 has been paid.
It is alleged that the United States refused to pay the re-servees interest upon their funded scrip until their removal west of the Mississippi, and in effect treated the payment of interest to the reservees as imposing upon the United States only the same obligation as was imposed by the act of 1842 as to the delivery of one-half of the scrip.
The record shows that only $171,400.34 (finding xx) has been paid by the Government, and it may be that such amount was paid upon the legal theory alleged in the petition. It does not appear from the findings whether upon that theory the defendants paid all the interest the reservees were entitled to; but by legal intendment of the petition it must be assumed that the Government paid interest when the reservees brought themselves within the condition of removal. Numerous decisions have been cited upon the question of the payment of interest, which in this connection it is unnecessary to quote, for, if what we have assumed as the legal effect of the act of 1852 and the release executed by the Choctaw Nation as to individual claims under the fourteenth article be correct, interest being an incident of the claims under said article, then such release and adjustment under the act of July 21,1852, is a complete answer to the claim of the petition upon the item of interest.
As was said in, another connection, the same authority which now brings this suit, assuming to represent the individual re-servees, discharged the United States from all liability growing out of a claim under the fourteenth article, and the interest claim, being an incident, falls with the original cause of action.
By the sixteenth article of the treaty of 1830 the defendants obligated themselves to remove the Indians to their new homes and furnish them with certain subsistence for the period of twelve months after such removal. It is alleged as an item of claim in this proceeding that the United States failed and refused to furnish such transportation and subsistence as pro *115 vided for in the treaty to nine hundred and sixty Choctaws who emigrated and subsisted themselves subsequent to the year 1834. The finding- on this item agrees substantially with the allegations of the petition, and shows that the commutation value in money for emigration and subsistence in similar cases as established by the United States at that time was $54.16.
It does not appear at what precise time between 1834 and 1845 the different persons composing the nine hundred and sixty left the State of Mississippi; but such emigration was in pursuance of the policy of the Government, both in the acquisition of the territory and the subsequent legislation of Congress, and for that emigration the claimant is entitled to recover on a liberal construction of the treaty of 1830 and that of 1855. It may be presumed that the most of the emigration was in the early part of the period included within the dates of the finding.
There was nothing in the treaty in the nature of a forfeiture clause, and if the one party continued to invite or permit emigration apparently upon the terms of the treaty, and the other continued to emigrate in the belief that the terms of the treaty were still operative to secure the reimbursement of their expenses, there is no reason why the instrument should not be treated like a contract which specifies a time for performance but contains no forfeiture clause, and under which the parties continue to perform by mutual acquiescence after the prescribed period has elapsed. Emigration being the purpose of the Government, it should be charged with the expenses incident thereto. This is especially so, because it was not only the policy and purpose of the Government to induce emigration, but acts of intimidation and persecution were resorted to on the part of the agents of the Government to coerce the departure of Indians.
This claim, so far as the facts of the record show, has never been adjudicated or settled in any form, and as it does not come within the purpose of the act of July, 1852, authorizing a settlement and release of certain claims, it is a proper subject of allowance in this case. Taking the number of Indians who never received a commutation for removal and subsistence at nine hundred and sixty, as shown by the record, and allowing what was then current as commutation allowance, it aggregates the sum of $51,993.
*116 By the fifteenth article of the treaty of 1830 it is provided that if the nation thinks proper to elect an additional principal chief the Government agreed to pay the sum of $500 a year as a salary to such officer.
If the facts found by the court sustained this claim the right to recover would be clear in law; but the findings do not show that after the making of the treaty in 1830 an additional chief was elected by the Choctaw people, and upon that branch of the case we find for the defendants.
By the stipulations of the twentieth article of the treaty of 1830 the Government agreed to furnish to each warrior who emigrated “rifles, molds, and ammunition,” and finding xix shows that subsequent to the year 1843 there were removed by the Government twelve hundred and thirty-six Choctaw warriors who were not supplied with “ rifles, molds, and ammunition,” and that the value in the aggregate at and after said time was $18,000.
The emigration of the warriors was not only in pursuance of the policy of the Government, but it may be inferred that it was at the instance of the Government; and it does not appear that there was any special arrangement between the Indians and the agents of the United States that the articles provided for in the twentieth provision of the treaty of 1830 were not to be given to those who emigrated to the Choctaw country. In the absence of such arrangement it is safe to assume that the Indians expected that they would be furnished with guns, ammunition, &c. The claim for these items has not been paid— is not embraced in any release or settlement made by the parties ; and, construing the rights of the claimant in the spirit of the eleventh article of the treaty of 1855, the petitioner should recover on that issue.
We have now disposed of the different items of the claim made by the petitioner, and insisted on in the argument by the-counsel of the claimant. In the main we have adjusted the rights of the parties against the legal theory upon which the suit is predicated in the pleading of the petitioner, but upon some of the branches of the cause we have found the facts and law in favor of the Choctaw Nation ; and in dealing with the questions presented by one of the most voluminous records ever submitted to a court we have availed ourselves of the *117 light afforded us by the very able arguments of counsel on both sides.
Aggregating the different amounts which we have found for the claimant, and deducting therefrom the payment made under the statute of 1861, it leaves a balance due the claimant of $408,120.32, and for that sum a judgment will be entered.
Scoeield, J., did not sit in this case and took no part in the decision.