## UNITED STATES *v.* PAYNE.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 240.　Argued February 25, 1924.—Decided April 7, 1924.

1. The United States, as guardian of tribal Indians, is bound to discharge its trust with good faith and fairness, and treaties made with them should be liberally construed. P. 448.
2. The treaty made in 1855 with the Quileute and other Indians, by which they surrendered broader claims for a limited reservation, provided for money " to clear, fence, and break up a sufficient quantity of land for cultivation," and authorized the President to assign " lands " in severalty to the Indians for permanent homes. *Held*, that timbered lands were not intended to be excluded from assignment. *Id.*
3. The General Indian Allotment Act should be construed when possible in harmony with previous Indian treaties. *Id.*
4. The General Allotment Act in limiting allotments to " eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian," was not meant to preclude an allotment of timbered lands, capable of being cleared and cultivated, but simply to differentiate, in the matter of area, between lands adaptable to agricultural uses and lands valuable only for grazing purposes. P. 449.

284 Fed. 827, affirmed.

APPEAL from a decree of the Circuit Court of Appeals which affirmed a decree of the District Court for the plaintiff and appellee, Payne, in his suit to determine his right to an allotment of land in an Indian Reservation.

*Mr. H. L. Underwood,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for the United States.

*Mr. Arthur E. Griffin,* with whom *Mr. Arthur R. Griffin* was on the brief, for appellee.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Appellee, an Indian of the Quileute tribe, brought suit in the Federal District Court for the Western District of Washington to determine his right to an allotment of an eighty-acre tract of land in the Quinaielt Indian Reservation in that State. Authority for bringing the suit is found in 28 Stat. 305, c. 290, as amended by 31 Stat. 760, c. 217. The treaty with the Quileute and other Indians, made in 1855, among other things, provides for the removal and settlement of these Indians upon a reservation to be selected for them by the President, and for the payment by the United States of $2,500 " to clear, fence, and break up a sufficient quantity of land for cultivation." 12 Stat. 971, Articles 2 and 5. The President is authorized by Article 6 of the treaty, at his discretion, to cause the reserved lands to be surveyed and assign the same to individual Indians or families for permanent homes on the same terms and under the same conditions as are provided in Article 6 of the treaty with the Omahas, concluded in 1854. 10 Stat. 1043, 1044. By the General Allotment Act, as amended, it is provided:

" In all cases where any tribe or band of Indians has been or shall hereafter be located upon any reservation created for their use by treaty stipulation, Act of Congress, or executive order, the President shall be authorized to cause the same or any part thereof to be surveyed or resurveyed whenever in his opinion such reservation or any part thereof may be advantageously utilized for agricultural or grazing purposes by such Indians, and to

cause allotment to each Indian located thereon to be made in such areas as in his opinion may be for their best interest not to exceed eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian . . . ” 24 Stat. 388, c. 119, as amended by 26 Stat. 794, c. 383, and 36 Stat. 859–860, c. 431.

The land in question was selected by Payne in 1911, after survey, through and with the approval of an allotting agent of the United States. It is of mixed character, forty or fifty acres being timbered, and the remainder being bottom land, lying along the Raft River.

The sole question we are called upon to decide is whether the land, being timbered, is to be excluded from the operation of the Allotment Act which speaks only of agricultural and grazing lands. Both courts below determined the question in the negative, 284 Fed. 827, and we agree with them. The treaty makes no restriction in respect of the character of the land to be “ assigned ”; and while the Allotment Act, being later, must control in case of conflict, it should be harmonized with the letter and spirit of the treaty so far as that reasonably can be done, since an intention to alter, and, *pro tanto,* abrogate, the treaty, is not to be lightly attributed to Congress. These Indians yielded whatever claims they may have had to a valuable and extensive area in exchange for a relatively small reservation, relying upon what they undoubtedly understood to be an assurance on the part of the general government that they would be given individual and permanent homes therein. They are an unlettered people, unskilled in the use of language, *Jones* v. *Meehan,* 175 U. S. 1, 10–11, with regard to whom the United States occupies the position and assumes the responsibilities of virtual guardianship, bound by every moral and equitable consideration to discharge its trust with good faith and fairness. *Choctaw Nation* v. *United States,* 119 U. S. 1, 28. Construing the treaty liberally in

favor of the rights claimed under it, as we are bound to
do, *Hauenstein* v. *Lynham*, 100 U. S. 483, 487, we con-
clude that the character of the lands thereafter to be set
apart for them severally was not restricted.    The au-
thority of the President is, broadly, to assign " lands," and
that it was not meant to exclude timber lands is borne
out by the provision for a payment " to *clear,* fence, and
break up a sufficient quantity of land for cultivation,"
which may well mean to " clear " it of timber.    It follows,
that if the Allotment Act is now construed to exclude such
lands from allotment, a materially restrictive change will
have been wrought in the terms of the treaty.    Such a
construction is to be avoided, if possible.    *Chew Heong* v.
*United States,* 112 U. S. 536, 541.

It is common knowledge that vast bodies of land, origi-
nally covered with timber, in some of the public land
States, including eastern Washington, have been acquired
by private entry, cleared and brought under cultivation.
The view that such lands were open to entry for agri-
cultural purposes seems to have been generally recognized
and acted upon (see *Johnson* v. *Bridal Veil Lumber Co.,*
24 Oreg. 182, 184–186) ; and, so far as we are advised, has
never been questioned by the Land Department of the
United States.    We are, therefore, constrained to reject
the rigidly literal interpretation of the Allotment Act for
which the Government here contends.    It is not an un-
reasonable view of the requirement that an allotment
shall not " exceed eighty acres of agricultural or one
hundred and sixty acres of grazing land " to say that it
was meant not to preclude an allotment of timbered
lands, capable of being cleared and cultivated, but simply
to differentiate, in the matter ᾽ of area, between lands
which may be adapted to agricultural uses and lands
valuable only for grazing purposes.

The decree of the Circuit Court of Appeals is

*Affirmed.*