Littleton, Judge (Ret.), with whom Madden, Judge,
concurs, dissenting:
This appeal, which the majority has disposed of summarily in a per curiam statement which merely affirms the determination of the Commission, concerns an entirely novel question which has been raised for the first time under the Indian Claims Commission Act and goes to the proper administration of that Act in the general area of accounting suits, a number of which are now pending before the Commission. While the instant suit was not brought strictly as a suit for an accounting, it is very similar , in nature to the accounting suits now pending before the Commission, and it will inevitably serve as a general guide to their disposition. In general, the grounds for this dissent from the position taken by the Commission and affirmed by the majority of this court, without analyzing the issues, are that the ruling of the Commission that the Government has no obligation *749 to render a clear and accurate accounting of its dealings and the fulfillment of treaty obligations in the manner of a fiduciary or of a superior and learned power dealing with an unlettered and inferior tribe or race, but is merely in a position of a debtor in its relationship under a treaty with the Indians, is contrary to the decisions of the Supreme Court, of this court, and of at least one of the Commission’s own opinions. In the Iowa Tribe of the Iowa Reservations in Kansas and Nebraska, et cetera case, Docket No. 70, decided June 19, 1952, 2 Ind. Cl. Comm. 167, 176, the Commission stated that:
In its dealings with the Tribe the defendant kept the only records of these transactions as a self-imposed duty to its illiterate and incompetent wards and thereby became accountable to them for the manner in which it discharged its treaty,, other assumed and Congressionally imposed obligations.
The Commission has erroneously placed great reliance on the mistaken view that denial of certiorari by the Supreme Court constitutes approval of the decision of the case wherein certiorari is denied. Moreover, I am of the opinion the Commission has not followed the principles of the decided cases nor the rules of this court with respect to burden of proof where the Government sets up and relies on the affirmative defense of payment (Kule 15(b) of the Eules of the Court of Claims). Finally, the per curiam opinion of this court falls far short of meeting the obligation of an appellate court to give guidance to the court below (the Indian Claims Commission) and to the litigants in an appeal on a novel and important matter, an obligation which, until this time, the court has conscientiously fulfilled. The appeal by the Indians in this case is in no sense frivolous and I am of the opinion that the litigants are entitled to an opinion showing that the court has not disregarded or overlooked the very serious arguments of counsel on both sides. Furthermore I believe that the majority mistakes this court’s appellate function in claims appealed from the Indian Claims Commission to be like that of the Circuit Courts of Appeals *750 in appeals from the District Courts. 28 U.S.C. § 1291. Section 20(b) of the Indian Claims Commission Act is quite explicit with regard to the manner in which this court is to review final determinations of the Commission. It provides:
On said appeal the Court shall determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting “fair and honorable dealings”, where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission’s findings of fact. In making the foregoing determinations, the Court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error. * * * [Emphasis supplied.] 25 U.S.C. § 70s(b).
In the instant case there are serious objections earnestly and fully argued by the appellant regarding the findings of the Commission and lack of findings by the Commission. For these reasons I am forced to state my views in some detail.
This is an appeal from a decision of the Indian Claims Commission. Appellant, the Creek Nation, brought an action under the Indian Claims Commission Act of 1946, 60 Stat. 1049, 25 U.S.C. §§ 70-70v, to recover for certain un. fulfilled obligations of the United States under five treaties between the Creek Nation and the United States.[1] Appellant alleged that the full amounts which the United States was obligated to pay to appellant under these treaties were not in fact paid, and appellant claimed the right to recover the unpaid balances. The United States denied that any sums were due, owing or unpaid under the treaties in question. It also presented defenses of res judicata and release.[2]
*751 This case involves the question of whether appellant made a sufficient showing that the Government did not fulfill its treaty obligations.
Appellant introduced in evidence before the Indian Claims Commission the records of treaty payments to appellant which were maintained by the Government and are now in the custody of the General Accounting Office. These records do not specifically show that the entire amounts due under the various treaties in issue were paid to appellant.
The amounts claimed by appellant are $62,309.75 under the Treaty of 1802, $86,547.75 under the Treaty of 1805, $10,061.01 under the Treaty of 1832, $29,404.55 under the Treaty of 1833, and $29,000 under the Treaty of 1856. The total claimed is $167,323.06.
I think that appellant established its claim to $26,396.05 of that amount. Another $29,000 appears to be due appellant, but the Government should have the opportunity upon remand to the Commission to show that the amount was paid. As to an additional $39,465.56, the Commission did not make certain essential findings of fact, and that portion of the case should have been remanded for such findings.
The basic issue in this case can be understood by a preliminary look at the problems arising in connection with the Treaties of 1802 and 1805.
With respect to the 1802 Treaty, 7 Stat. 68, the parties agree that the total obligation under Article II was $317,000. The General Accounting Office report shows the amount specifically allocated to payment of obligations under the 1802 Treaty to be $254,690.25. The parties also agree that the total obligation under Article III of the 1805 Treaty, 7 Stat. 96, was $206,000. The G.A.O. report shows $169,452.25 as disbursements made in connection with the 1805 Treaty. Appellant claims, therefore, that there is an unpaid balance of $62,309.75 due under the 1802 Treaty, and of $36,547.75 under the 1805 Treaty, making a total under the two treaties of $98,857.50, and it complains of the Commission’s failure to so find.
The G.A.O. report also shows that, during the years 1803 through 1809, a total of $77,263.45, in money and goods, was *752 paid and forwarded to the Creek Indians.[3] For the years 1811, 1815, 1817 and 1818, payments totaling $22,198 are shown to have been made to the Creeks. No part of this total amount of $99,461.45 was allocated by the G.A.O. report to any particular treaty.
Appellee’s contention is that, because appellant did not show that any of this $99,461.45 was not paid in satisfaction of the obligations of the 1802 and 1805 Treaties, the Government is entitled to credit the entire amount against its obligations under those treaties. The $99,461.45 exceeds the $98,857.50 claimed by appellant to be due, so appellee’s theory would defeat recovery under these two treaties. The Indian Claims Commission adopted the Government’s position and determined that nothing was due to appellant. 7 Ind. Cl. Comm. 117.
Appellant argues that the relationship between the United States and an Indian tribe is such that the Government has the burden of presenting an accurate accounting of its payments to appellant pursuant to the treaties in question. Appellant maintains, therefore, that the Government is not entitled to credit for any amounts not specifically allocated on its books to fulfillment of these treaties.
I think that the decisions of the Supreme Court of the United States, and the prior decisions of this court, establish that the relationship between the United States and an Indian tribe is sufficiently similar to the relationship between a guardian and its ward to impose upon the United States the burden of clearly accounting for its fulfillment of its Indian treaties.
I also think, however, that appellant here has attempted to draw a more ambitious conclusion than is warranted from the fact of its relationship with the Government. While the *753 Government had the duty to clearly account for its performance of its treaty obligations, I think that it has done so when it has shown payments to the Creek Nation which, although not specifically labeled as payments pursuant to the treaties in question, are sufficiently identified in the Government’s records to show that they could have been nothing other than payments pursuant to those treaties. For example, if payments labeled “annuities for the Creeks under Creek treaties” are listed in the Government’s records for years in which no treaty other than the treaty in question was in force, the conclusion is warranted that the payments were made under the treaty in question.
THE RELATIONSHIP BETWEEN THE PARTIES
The Supreme Court has on numerous occasions made clear that the duties owed by the Government of the United States to the Indian tribes with which it deals are of the most exacting nature, to “be judged by the most exacting fiduciary standards.” Seminole Nation v. United States, 316 U.S. 286, 297. The basis for the high obligations owed by the Government was established as early as 1831, in Cherokee Nation v. Georgia, 5 Pet. 1, 16-17, where the Court, speaking through Chief Justice Marshall, stated:
[The Indians] are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.
With respect to the relationship between the Creek Nation and the United States, the Supreme Court has said, in Creek Nation v. United States, 295 U.S. 103, 109-110:
* * * The tribe was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government.
* * * It was in a state of tutelage and entitled to rely on the United States, its guardian, for needed protection of its interests.
The Indian Claims Commission itself has recognized that a “fiduciary relationship” exists between the Creek Nation *754 and the United States. The Creek Nation v. United States, 2 Ind. Cl. Comm. 66, 114.
The Supreme Court further defined and established the nature of the relationship between the Government and the Indian tribes as similar to that of guardian and ward in United States v. Kagama, 118 U.S. 315, where the Court said, “These Indian tribes are the wards of the Nation.” 118 U.S. at 383.
Appellee places great reliance upon an 1886 decision of this court, Choctaw Nation v. United States, 21 Ct. Cl. 59, where it was said that the cases “fall far short of holding that the rules of law as applicable to controversies between guardian and ward are to prevail in suits between the United States and the Indian tribes.” 21 Ct. Cl. at 92-93. Ap-pellee has overlooked the fact that the decision was reversed by the Supreme Court, in Choctaw Nation v. United States, 119 U.S. 1, and that the Supreme Court said:
As was said by this court recently in the case of the United States v. Kagama, 118 U.S. 375, 383: “These Indian Tribes are the wards of the Nation; they are communities dependent on the United States; * * *”
$ $ $ $ *
The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and_that inequality is to be made good by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons, equally subject to the same laws. 119 U.S. at 27-28.
The Court repeated, in United States v. Payne, 264 U.S. 446, that, with regard to the Indians,
*755 * * * the United States occupies the position and assumes the responsibilities of virtual guardianship, * * * 264 U.S. at 448.
Of particular importance is the Supreme Court’s ruling in Seminole Nation v. United States, 316 U.S. 286, which involved the question of the handling of annuity payments to Indians. It is true that the treaty had set up a “trust fund” out of the interest from which the annuities were to be paid. But the Supreme Court did not base its conclusion upon the “trust nature” of the particular fund involved. The Court stated:
* * * this Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people. [Citations omitted.] In carrying out its treaty obligations with the Indian tribes, the Government is something more than a mere contracting party. Under a humane_ and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards. 316 U.S. at 296-297.
The Court made clear that the Government’s fiduciary responsibilities derive from the status of the “dependent and sometimes exploited” Indians, and that the Government bears these responsibilities “m its dealings'1'1 with the Indians, not, as defendant would have it, merely in connection with those particular dealings which, when occurring between two equal parties, would give rise to fiduciary duties.
The Indian Claims Commission relied 'heavily, in its decision of this case, upon Chickasaw Nation v. United States, 103 Ct. Cl. 1, certiorari granted, limited to question of specific designation of offsets, and judgment reversed, 326 U.S. 217. That case does support appellee’s position, but does not have the weight attributed to it by the Indian Claims Commission as a result of the Commission’s misconception of the meaning of the Supreme Court’s denial of certiorari as to the issues relevant to this case.
*756 In Chickasaw the Government’s records showed that it bad purchased annuity goods for various tribes, but did not show how much of these goods had been allocated to the Chickasaws as distinguished from the other tribes. This court said, “Unless this allocation is known, the shortage, if any, in the goods annuity of $3,000 cannot be ascertained. The accounts show no shortage for which judgment may be given.” 103 Ct. Cl. at 35-36. It should be noted, however, that the problem did not receive extended consideration by this court in Chickasaw. The Indian Claims Commission, however, in relying upon Ohichasa/w rather than upon more recent decisions of this court which support the conclusion which I would reach, stated that “The refusal of the Supreme Court to allow certiorari on the matters * * * specifically called to its attention [in Chickasaw] is evidence that it approved the holdings of the Court of Claims in reference to such matters.” 7 Ind. Cl. Comm. at 135. The Commission went on to say that the decision of this court in Sioux Tribe of Indians v. United States, 105 Ct. Cl. 725, infra, “could not overrule the [Chickasaw case] because the Sioux case is a Court of Claims opinion only, while the holdings in the Chickasaw case were approved by the Supreme Court by its refusal to grant a writ of certiorari.” 7 Ind. Cl. Comm. at 137.
The Supreme Court has made clear that no such inference is to be drawn from its denial of certiorari in any case.[4]
The Government strenuously urges that the fact that appellant and the Government stand in a creditor-debtor *757 relation precludes the conclusion that it owes appellant the duties of a trustee. The Government’s contention is expressly negatived by the language of this court in Menominee Tribe v. United States, 101 Ct. Cl. 10, 20, where the court stated that the Government is “a debtor who stands in the position of a trustee or fiduciary toward his creditor,” when the creditor is an Indian tribe. The Supreme Court, in Quick Bear v. Leupp, 210 U.S. 50, 80, said that the amounts there in question, a “Treaty Fund” of annual appropriations for payment of treaty stipulations, i.e., for payment of a debt to the Indians, had “exactly the same characteristics” as a “Trust Fund” applied to the education of the Indians. The Court said, “They are moneys belonging really to the Indians.” 210 U.S. at 81.[5] That case clearly shows that the treatment of payments of a debt may be governed by fiduciary obligations when the debt is one owed by the United States to an Indian tribe. As the Supreme Court said in Seminole Nation v. United States, supra, 316 U.S. at 297, “In carrying out its treaty obligations with the Indian tribes, the Government is something more than a mere contracting party.”
This court has recognized that it is “settled doctrine that the United States, as regards its dealings with the property of the Indians, is a trustee.” Menominee Tribe v. United States, 101 Ct. Cl. 10, 19. In that case, the Government was merely a debtor, yet the court held that it would “test the conduct of the Government, in its handling of the funds of the plaintiff Indians, by the standards applicable to a trustee.” 101 Ct. Cl. at 19. The duty there imposed on the Government was that of seeing to it that the Indians’ property — claims against the Government — was productive of an income. This is certainly more than the duty of an ordinary debtor, and no less rigorous than the duty of keeping a clear account of the Indians’ claims. The court characterized the Government’s position as that of “debtor-with-the-duties-of-a-trustee”, 101 Ct. Cl. at 19 (and has recently characterized *758 the Indians as “quasi wards”, Chickasaw Nation v. United States, 182 Ct. Cl. 359, 362) .[6]
I think that the above discussion indicates that the debt owed to an Indian tribe pursuant to a treaty must be “dealt with by the Government as if it belonged to [the Indians], as morally it does”, Quick Bear v. Leupp, 210 U.S. 50, 80, supra, and that the Government is bound by duties of trust in dealing with this money. Menominee Tribe v. United States, 101 Ct. Cl. 10, 19, supra. The decision of this court in Sioux Tribe v. United States, 105 Ct. Cl. 725,[7] is, therefore, directly applicable here.
The defendant is the trustee; it kept and has all the records and evidence, and it has the burden of making a proper accounting. 105 Ct. Cl. at 802.
In the Sioux case, the Indians sought to recover certain amounts disbursed by the Government from trust funds *759 which had arisen from the sale of land belonging to the Indians. The disbursements had been made by the Government for certain Indian agency and educational expenses. The Indians claimed that the disbursements were for obligations of the Government, so that they should not have been paid out of the Indians’ funds. The Government maintained that the expenditures were proper charges against the Indians’ funds since they were expenditures for the benefit of the Indians, and argued that the Indians had the burden of showing what portion of the disbursements were for obligations of the Government. It said that in the voluminous accounting as to the claims presented it could not be expected to detail with exactness the purposes and amounts of the many disbursements, and that the burden rested on the Indians to prove such details. The court held, however, that the “primary duty to so classify and report as to the nature and the amount of disbursements rested on defendant.” 105 Ct. Cl. at 802.
The court said:
Since the Government obligated itself in the treaty and the agreements of 1868, 1877, and 1889 to provide agencies, aid and assistance, schools, and instruction, the burden is on defendant to show what portion, if any, of such expenses has not been assumed by it and should be charged to the Indians. The Government cannot escape its primary obligations by including, among improper charges against the Indians, expenditures which it now says, without proof, may hme been to some unknown and unascertainable extent proper charges against the Indians. The defendant is the trustee; it kept and 'has all the records and evidence, and it has the burden of making a proper accounting. 105 Ct. Cl. at 802. [Emphasis supplied.]
The Indian Claims Commission attempted to distinguish the Sioux case on the grounds that it involved a “trust fund” whose handling was “governed by the rules applying to trustee and guardian,” while the present case “only involves the relationship of * * * ordinary debtor and creditor.” 7 Ind. Cl. Comm, at 135-136. Since, as has been demonstrated above, an Indian tribe and the Government are not *760 “ordinary debtor and creditor”, and the Government’s handling of its debts to the Indians is in fact “governed by the rules applying to trustee and guardian”, the Sioux case is very much in point here.
The relationship between the United States and appellant is not precisely that of guardian and ward, but their relationship is sufficiently similar thereto to impose upon the United States the duty of maintaining a clear and unambiguous account of its payments to appellant under its various treaty commitments.
The conclusion that the United States owes to an Indian tribe the duty of maintaining a clear account is in accord not only with the authoritatively established nature of the relationship between the Government and the Indian tribes, but also with a practical understanding of the problems involved in this particular aspect of the dealings between these parties. Throughout the time during which the treaty payments here in issue were due, the Indians were largely illiterate and unskilled in the ways of the men who had arrived from Europe. Particularly unfamiliar must have been the ways of bookkeeping and accounting. To compare the facilities and capacity for maintaining financial records possessed by the United States Government with those possessed by the Indians, whose life was oriented so differently, is to reveal the reasonableness of the conclusion that the United States is charged with keeping a clear account of the payments it makes pursuant to its obligations to the Indians.
TREATIES OP 1802 AND 1805
As was pointed out in the introductory section of this opinion, appellant is claiming an unpaid balance of $98,857.50 under the Treaties of 1802 and 1805. The Government claims credit for $99,461.45, an amount which the Government’s records do not specifically show to have been paid under these treaties. In the light of what I believe to be the nature of the relationship between the parties in this case, I think that the Government is entitled to credit for only that portion of the $99,461.45 which is sufficiently identified in its rec *761 ords as having been paid under the 1802 and 1805 Treaties.[8]
To show that some of the unallocated $90,461.45 could have been disbursed pursuant to treaties other than those of 1802 and 1805, appellant points to the Treaty of August 7, 1790, 7 Stat. 35, Article IV of which provided that the United States pay to the Creeks an annuity of $1,500. The United States also undertook to furnish domestic animals, farm implements, and interpreters to the Creeks. Appellant claims that the obligation to provide interpreters was worth $400 per year, and that the 1790 Treaty contained a secret article which obligated the United States to pay to Creek Chief Alexander McGillivray an annual stipend of $1,200, and to each of six other chiefs annual stipends of $100 for life. Appellant thus claims that the 1790 Treaty established a yearly obligation on the United States of $3,700. Appellee points out that there is no evidence of any secret article in the 1790 Treaty. Chief Alexander McGillivray died in 1793, so no part of his life annuity of $1,200 can have been included in the payments made starting in 1803. There is no showing as to the dates of death of the other six chiefs allegedly entitled to $100 life annuities.
It is clear, however, from the face of the treaty that there was an obligation of at least $1,500 per year. For the years 1790 through 1797, and 1800 through 1809, a total of eighteen years, the Government’s records do not specifically show pay *762 ment of this $1,500 annuity, so I think we should assume that at least $27,000 of the payments made from 1803 to 1818 were made in fulfillment of the 1790 Treaty obligation. Thus, of the $99,461.45 shown by the Government’s accounts to have been paid to the Creeks, but not allocated to specific treaties, there is at most $72,461.45 which can be credited to the Government as fulfillment of its obligations under the Treaties of 1802 and 1805.
Appellant also points to the Treaty of June 29, 1796, 7 Stat. 56, and contends that some of the payments shown to have been made to the Creeks between 1803 and 1818 should be allocated to the 1796 Treaty. It may be noted, however, that all the payments listed in the G.A.O. report are labeled annuities, or goods for Chiefs. No expenditure under the 1796 Treaty could be so described, since that treaty provided for no annuity, or goods to chiefs. The 1796 Treaty obligations cannot, therefore, account for any of the payments shown to have been made to the Creeks from 1803 through 1818.
The amount of obligations under the 1802 and 1805 Treaties which are not specifically shown by the Government’s accounts to have been fulfilled is, as noted above, $98,857.50. The Government’s accounts are specific enough, in the absence of any other treaty provisions under which the unallocated payments which its accounts show to have been made could have been due, to show payment of $72,461.45 of that amount, leaving $26,396.05 which is not shown to have been paid. In addition, I think that appellant should be permitted, upon' a remand to the Indian Claims Commission, to show any other obligations of the United States, in addition to the $1,500 under the 1790 Treaty, for which the payments shown for 1803 through 1818 could have been intended, so that the amounts of such obligations could be subtracted from the $72,461.45 which I find to be the maximum allowable to the Government against its 1802 and 1805 treaty obligations, given the state of its records.
TREATY 03? 1832
Under Article XIII of the Treaty of March 24, 1832, 7 Stat. 366, the United States agreed to expend $3,000 per *763 year for twenty years for the education of Creek children. The parties agree that the total obligation under the 1832 Treaty was $60,000.
Appellant admits that the Government’s records are sufficient to show payment of $49,938.99, and it claims the additional $10,061.01.
The Indian Claims Commission did not, for some reason, make any finding as to the additional credits against this claim asserted by the Government, but stated only that
There were disbursements for the period 1862 to 1861 in the amount of $60,673.23 * * * in fulfillment of the obligations of the treaties of 1832 and 1845 [9 Stat. 821] which defendant contends is in full settlement of its obligation made by the Treaty of 1832 and renewed and enlarged by the Treaty of 1845.
Appellant objects to the Commission’s failure to make any finding as to whether or not the Government’s obligation under the 1832 Treaty was fulfilled.
I think that the Commission’s failure to find whether the 1832 Treaty obligation was fulfilled requires us to remand this portion of the case to the Commission for such a finding. On its face, the Commission’s “finding” is merely a restatement of the Government’s contention, and not a finding at all.
The Commission’s “ultimate” finding that there was not sufficient evidence in the record to show that any of the indebtedness claimed by appellant had not been discharged does not remedy its failure to make a material finding of fact. Where required findings are not made by the Commission, the court will set aside the Commission’s final determination and remand the case so that such findings may be made. Snake or Piute Indians v. United States, 125 Ct. Cl. 241, 255.
TREATY OF 1833
The Treaty of February 14,1833, 7 Stat. 417, provided, in Article Y:
As an evidence of the kind feeling of the United States towards the Muskogee Indians, and as a testimonial of the [their] gratification with the present amicable and satisfactory adjustment of their difficulties with the Cherokees, experienced by the commissioners, they agree on behalf of the United States, to furnish to the Creek *764 Indians west of the Mississippi, one blacksmith and one wheelwright or wagonmaker, as soon as they may be required by the nation, in addition to those already employed — also, to erect shops and furnish tools for the same, and supply the smith shops with one ton of iron and two hundred and fifty pounds of steel each; and allow the said Creek Indians, annually, for education purposes, the sum of one thousand dollars, to be expended under the direction of the President of the United States — the whole of the above grants to be continued so long as the President may consider them conducive to the interest and welfare of the Creek Indians: * * *.
Appellant claims that the Government’s total obligation under this Article was $105,690 ($2,700 per year for 39 years), and that only $76,285.45 has been paid thereunder, so that a balance of $29,404.55 remains due.
In this instance appellee does not claim credit for more than the $76,285.45 which its records show it to have paid under the 1833 Treaty. Appellee’s contention is that the size of the obligation under the 1833 Treaty was not adequately established. Appellant’s position is that Congress fixed the amount of the treaty obligations by the size of annual appropriations which it made under the treaty.
The Indian Claims Commission concluded that it was unnecessary for it to determine whether the basis for establishing the treaty liability as contended for by appellant was correct, in view of its holding that appellant had “not proven the alleged failures of the appellee to fulfill its obligations * * 7 Ind. Cl. Comm., 138. Since I would conclude that appellant has laid sufficient basis for a conclusion that appellee failed to fulfill its obligations, I think that it was necessary for the Indian Claims Commission to determine the amount of the Government’s obligation under the 1833 Treaty. I would therefore remand this portion of the case to the Commission for such determination.
TREATS' OE 1856
Under Article VI of the Treaty of August 7, 1856, 11 Stat. 699, the United States undertook to invest $200,000 in safe stocks, and to apply the interest of at least 5% per annum to the education of the Creeks. Appellant claims that the stipulated interest for the years 1857 through 1861, *765 inclusive, a total of $50,000, was appropriated by Congress, but that appellee’s records show distributions of only $21,000 pursuant to this obligation. Appellant claims the balance of $29,000. Appellee claims credit for two separate payments of the $29,000.
(1) First, appellee claims that the $29,000 was paid to the Creek Nation by the Confederate States of America, pursuant to a treaty, dated July 10, 1861, between the Confederate States and the Creek Nation. Appellee asserts that the Creek Nation’s acceptance of the payment by the Confederate States of the United States’ obligation discharged the United States’ liability.
Appellant does not contest appellee’s proposition of law, but denies that there was proper payment or, if there was, that it was validly accepted by the Creek Nation.
The Indian Claims Commission found:
In a treaty dated July 10, 1861, between the plaintiff and the Confederate States of America, it was agreed that the Confederate States of America would pay said sum of $29,000 due and owing by the United States.
The Confederate States paid the $29,000 and plaintiff accepted the same.
The United States Congress also approved the payment of the $29,000 involved in this claim for the benefit of Indians remaining loyal to the United States during the Civil War, which expenditure the plaintiff Indians approved and ratified in the Treaty of June 14, 1866.
Appellant argues that the Treaty of July 10,1861, between the Creek Nation and the Confederate States, concluded at North Fork Village on the North Fork of the Canadian River, west of Arkansas, which provided for the payment of the $29,000 by the Confederate States, was only approved by some of the Creek chiefs without the action of the Creek Council, the governing body of the Creek Nation, and that the Creek Nation was about evenly divided in sympathies between the Union and the Confederacy.
I do not think that there is any evidence that the $29,000 was paid to the Creek Nation. The evidence shows that in Article XLI of the 1861 Treaty, the Confederate States agreed to pay the $29,000; that the Provisional Congress *766 of the Confederate States appropriated the $29,000 on December 24, 1861; that on December 80, 1861, that amount was requisitioned by J. P. Benjamin, the Confederate Secretary of War, from the Confederate Secretary of the Treasury; that on the same date C. G. Memmenger, the Secretary of the Treasury, ordered a War Department Warrant No. 16 to be issued in favor of General Albert Pike, a War Department agent, for delivery to Major Elias Eector, Superintendent of Indian Affairs; that on January 1, 1862, S. S. Scott, Acting Commissioner of Indian Affairs, wrote to Major Eector at Fort Smith, Arkansas, informing him that the money was in the hands of General Pike for delivery to him; and that on January 28,1862, General Pike wrote to Major Eector from Little Eock, Arkansas, informing him that he supposed he would reach Fort Smith in six days. It is true that there is no receipt for the $29,000, but in the light of the evidence which I have detailed, I think it was not improper for the Indian Claims Commission to conclude that the money was received by the Indians. See Chickasaw Nation v. United States, supra, 103 Ct. Cl. at 35.
However, although the evidence may be sufficient to support a finding that a payment of $29,000 was made to some Creek Indians, there is no indication that this payment was made to the Creek Nation, as distinguished from some portion thereof. The obligation here was owed to the Creek Nation, and could not be satisfied by payment to any party other than the Creek Nation. Debts can only be satisfied when paid to the creditors to whom they are due, or to others by direction of lawful authority. Therefore, a payment to any party other than the Creek Nation, even if that party was some portion of the Creek Nation, cannot have satisfied the obligation owed to the Creek Nation unless the party receiving payment was authorized to receive it on behalf of the Creek Nation. The evidence upon which appellee relies to show payment indicates that no payment was made to any party before January 28, 1862, on which date General Pike, the Confederate representative charged with delivering the money to the Creeks, was still at Little Eock, Arkansas. The evidence also indicates that after the treaty with the Confederacy had been signed on July 10,1861, a considerable *767 portion of the Creek Nation, under the leadership of Opoeth-le-yo-ho-la, was in sympathy with the Union. This group met in convention on August 5 and declared that the chiefs who had signed the Confederate treaty had forfeited their administrative rank. A “Non-Treaty Party” moved westward to avoid the reach of those who were sympathetic to the Confederate cause, and sent messengers to confer with representatives of the United States. The evidence also shows that by November 15, the Union-minded Creeks had withdrawn further north, toward the southern border of Kansas, and that they fought a series of battles with Confederate forces along the shores of the Arkansas and Yerdegris Bivers throughout November and December of 1861. The size of the group with Opoeth-le-yo-ho-la is estimated at around 2,000 men, plus women, children, and the sick and aged, in a total number of perhaps 6,000, estimated to be from one-half to three-fourths of the Creeks. It also appears that during the months of November and December representatives of the refugee Creek groups were treating with United States agents for relief for the refugees and arranging for the rendering of military assistance by the Creeks to the United States.
It seems to me to be clearly established by the evidence that the Creek Nation had become divided into two independent entities. It cannot be said that the portion which remained in the South constituted, after some time in November of 1861, the Creek Nation. Payment to this southern group cannot be said to have been payment of the obligation which was owed to the Creek Nation.
The record is barren of any evidence to show payment to an entity which could be called the Creek Nation. Indeed the evidence indicates, on the contrary, that payment was made to a body other than the Creek Nation, since it shows, as pointed out by appellee, that payment was made somewhere in the vicinity of Little Bock, Arkansas (that is, at the camp of the Southern group) some time after January 28,1862 (that is, when the Creeks remaining in that vicinity no longer constituted the Creek Nation).
(2) The basis for appellee’s second claim of credit for a second payment of the $29,000 is that the United States au *768 thorized payments, out of Creek annuities which had not yet been paid, for the benefit of refugee Indians during the Civil War, Resolution of February 22, 1862, 12 Stat. 614; that the $29,000 here in question was so used; and that the use of the annuities for that purpose was ratified and confirmed by appellant by Article XI of the Treaty of June 14, 1866, 14 Stat. 785,789-790.
The Supreme Court’s decision in Seminole Nation v. United States, 316 U.S. 286, 290-291, supports appellee’s legal position, if in fact the $29,000 here in question has been shown to have been disbursed for the benefit of refugee Indians. In the Seminole case this court had found that the $61,563.42 in question had been diverted and disbursed by the Government.
While it is clear that payments were made by the United States for the benefit of refugee Indians, I do not think that there is substantial evidence in this case to support a finding that the $89,000 in issue was in fact paid to refugee Indians. I note that the Indian Claims Commission did not so find. It found only that the United States Congress had approved such payment for the benefit of refugee Indians,[9] “which expenditure the plaintiff Indians approved and ratified in the Treaty of June 14, 1866 (14 Stat. 785, 790).”
The Treaty of 1866 approved and confirmed essfenditwes made by the United States since the diversion of annuities for that purpose. The fact that other annuity money was diverted for payment to the refugees does not establish that the United States’ obligation for this $29,000 was released.
The evidence in this case shows that $343,321.17 was disbursed by the United States, during the years 1862 to 1867 for the relief of refugee Indians, under the appropriation entitled “FulfiEing Treaties with Creeks.” Appellee says that Creek treaties in force during that period provided for a total of $229,260 in annuities payable to- the Creeks. This figure appears to have been taken from the total amounts appropriated under Creek treaties by Congress in the fiscal years 1862-1866.
*769 Appellee argues that because the amount expended for the relief of refugee Indians exceeded the total of the United States’ obligations for the period in question by more than $29,000, the $29,000 due under Article VI of the Treaty of 1856 is shown to have been expended for the refugee Indians. This does not follow at all. There may well have been other outstanding Creek treaty obligations which formed the basis for the 1862-1867 expenditures. Indeed there must have been, since the excess of expenditures over current treaty obligations was considerably more than $29,000.
Unless, upon remand to the Indian Claims Commission, appellee could show that the $29,000 due under the 1856 Treaty was among the sums disbursed in 1862-1867, either by pointing to an explicit accounting for that obligation, or by showing that the total of the treaty obligations payable to the Creeks was not greater than the amount of 1862-1867 expenditures in excess of current obligations, or otherwise, I think that appellant is entitled to recover the $29,000.
For the foregoing reasons, I respectfully dissent.

 The treaties involved are those of June 16, 1802, 7 Stat. 68; November 14, 1805, 7 Stat. 96; March 24, 1832, 7 Stat. 366; February 14, 1833, 7 Stat. 417; and August 7, 1856, 11 Stat. 699.

 Because of its resolution of this case on the ground that appellant had not proved its case, the Indian Claims Commission did not deal -with the issues of res judicata and the effect of the release given by appellant in 1856. These issues will not, therefore, be dealt with in this dissenting opinion.

 Appellant’s contention that the fact that the section of the G.A.O. report which lists these disbursements Is labeled “* * * Information relative to disbursements made by the united States for the benefit of the Creek Nation of Indians pursuant to the Treaty of August 7, 1790, 7 Stat. S5’’ (emphasis supplied) shows that the disbursements had no relation to the 1802 or 1805 Treaties is negatived by the statements in the body of the section that the payments could not be definitely attributed to any particular treaty, and also by the separate listing within the section of other disbursements which could be allocated definitely to the 1790 Treaty.

 United States v. Shubert, 348 U.S. 222, 228-229; Sunal v. Large, 332 U.S. 174, 181; House v. Mayo, 324 U.S. 42, 48; Atlantic Coast Line R. Co. v. Powe, 283 U.S. 401, 403-404; United States v. Carver, 260 U.S. 482, 490; Hamilton-Brown Shoe Co. v. Wolf Bros, and Co., 240 U.S. 251, 258. See also dissenting opinion of Mr. Justice Frankfurter in Darr v. Burford, 339 U.S. 200, 226-228, where he stated at page 226:
“The significance of a denial of a petition for certiorari ought no longer to require discussion. This Court has said again and again and again that such a denial has no legal significance whatever bearing on the merits of the claim. The denial means that this Court has refused to take the case. It means nothing else.
* * * * *
“Nothing is more basic to the functioning of this Court than an understanding that denial of certiorari is occasioned by a variety of reasons which precludes the implication that were the case here the merits would go against the petitioner.”

 The Government, in its brief in this case, acknowledges that the “treaty stipulations made the basis of claim herein, and the allegations of the petition respecting them fall into” the category which the Supreme Court in Quick Bear v. Leupp described as “the Indians’ money”.

 This court’s language In Gila River Pima-Maricopa Indians v. United States, 135 Ct. Cl. 180, 189, relied on by the Government, is not to the contrary. All that was said in that case was that the precise, formal guardian-ward relationship between the united States and an Indian tribe is created by treaty or other specific provision, while in the absence of such express provision, the relationship is one which is similar to or resembles the technical guardian-ward relationship, as was held in Creek Nation v. United States, 318 U.S. 629, 642; Seminole Nation v. United States, 316 U.S. 286 ; and Menominee Tribe of Indians v. United States, 102 Ct. Cl. 555.
This court’s opinion in the recent case of United States v. The Seminole Nation, 146 Ct. Cl. 171, 180-181, makes clear that all the Gila River case said was that while “preciseness” in the relationship is found in the particular treaty provision, the nature of the relationship between the United States and Indian tribes in general is that of “a fiduciary relationship”. The court said, at p. 180:
“Whatever the expression or term used, the relationship is one founded upon a distinctive obligation of trust. The obligation owed by the Government basically grows out of the dependent status of its Indian ‘wards’.”
I am also aware of what was said in Kansas or Kaw Tribe of Indians v. United States, 80 Ct. Cl. 264, 301-302, cert. denied, 296 U.S. 577, to the effect that a treaty provision similar to that of Article II of the 1790 Creek Treaty did not create a guardian-ward relationship. That ease was decided on December 3, 1934, prior to the Supreme Court’s decision in Creels Nation v. United States, supra, announced on April 29, 1935. I think that the Creels case vitiates any broad force of this language in the Kansas case, which can mean only that a technical guardian-ward relationship does not exist. See United States v. Seminole Nation, supra. Por the same reason the language in Omaha Tribe of Nebraska v. United States, 6 Ind. Cl. Comm. 68, 71—74, is of doubtful validity, and is based primarily on the Kansas case and a misinterpretation of the Gila River case.

 Certiorari granted, judgment vacated, and case remanded to Court of Claims for determination as to whether plaintiff-petitioner could assert any additional claims, 329 U.S. 685; supplemental petition dismissed, 112 Ct. Cl. 50; cert. denied, 337 U.S. 908.

 The G.A.O. report lists disbursements totaling $22,198 In a section 'which says that it contains Information relative to disbursements made during the years 1811 to 1834. Appellant therefore points to some ten treaties other than those of 1802 and 1805 between the Creek Nation and the united States which were in force during that period (Treaties of 1790, 1796, 1814, 1818, 1821, 1825, 1826, 1827, 1832 and 1833), and argues that the $22,198 may have been disbursed pursuant to some one of these treaties. We note, however, that although the section contains payments made from 1811 to 1834, the $22,198 in question is listed as having been paid in 1811, 1815, 1817 and 1818. It cannot, therefore, have been paid pursuant to any of the six treaties concluded after 1818. The effect of the 1790 and 1796 Treaties is discussed in the body of the opinion. The Treaty of August 9, 1814, 7 Stat. 120, does not appear to provide for any payments such as those listed for 1815, 1817 or 1818. That leaves the Treaty of January 22, 1818, 7 Stat. 171, which did provide for the payment in 1818 of $20,000, and which could therefore be the basis for the disbursement of the $12,285.58 listed for 1818. However, the G.A.O. report shows that $125,285.58 was disbursed specifically under the 1818 Treaty, which only provided for payment of $120,000 plus the furnishing of two blacksmiths and strikers for three years. It does not appear therefore, that the $22,198 could have been a disbursement pursuant to the 1818 Treaty.

 This approval was not specifically of the $29,000, but of all “annuities payable to the * * * Creeks * * * and which have not been paid.” Resolution of February 22, 1862, 12 Stat. 614.