Leo **WILLIAMS**, Petitioner-Appellant,

v.

**William P. CLARK, Secretary of the Interior, United States of America, et al., Respondents-Appellees.**

No. 83–4229.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1984.

Decided Sept. 11, 1984.

Jon Marvin Jonsson, Seattle, Wash., Dennis J. Whittlesey, Whittlesey & O'Brien, P.C., Washington, D.C., for petitioner-appellant.

Frederick L. Noland, MacDonald, Hoague & Bayless, Seattle, Wash., Donald T. Hornstein, Dept. of Justice, Washington, D.C., for respondents-appellees.

Before KILKENNY, NELSON, Circuit Judges, and EAST[*], District Judge.

NELSON, Circuit Judge:

Leo Williams, a member of the Quileute Tribe of Indians, appeals the district court's affirmance of a decision by the Interior Board of Indian Appeals (IBIA). The IBIA decision reversed the Administrative Law Judge's (ALJ) ruling that Williams is an eligible devisee of land on the Quinault Indian Reservation. We reverse the district court's decision and reinstate the ALJ's decision ordering distribution of the Quinault Reservation land under the will of Williams's deceased cousin, Joseph Willessi.

[*] Hon. William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

## FACTUAL AND PROCEDURAL BACKGROUND

Joseph Willessi, a member of the Quileute Tribe, executed a will in which he devised land on the Quinault Reservation to Williams.[1] The property is part of the Indian lands held in trust by the United States. After Willessi died, his heirs contested the will. On February 10, 1972, the ALJ approved it and ordered distribution. The IBIA ordered a rehearing. On January 6, 1977, the ALJ again approved the will and ordered distribution.

On April 5, 1978, the Bureau of Indian Affairs petitioned the ALJ to reopen the estate proceedings. The BIA alleged for the first time that section 4 of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–79 (1982) ("IRA"), bars Williams from receiving an interest in trust land on the Quinault Reservation because Williams is neither an heir nor a member of the Quinault Tribe of Indians. Three months later, the heirs also petitioned to reopen.

After initially holding Williams ineligible, the ALJ ruled that Williams is an eligible devisee. The ALJ determined that the Quinault Tribe's jurisdiction over the Quinault Reservation is not exclusive. Thus, he determined that the Quileute Tribe also had jurisdiction over the Quinault Reservation such that Williams was an eligible devisee. The IBIA reversed, holding that section four of the IRA bars Williams from inheriting the trust lands because the only permissible devisees were members of the Quinault Tribe and Willessi's heirs. Because Williams fell into neither of these classifications, he was not a permissible devisee. The district court affirmed the IBIA's decision and Williams timely appeals.

## DISCUSSION

### I

#### Standard of Review

This appeal requires us to interpret statutory and treaty language. It is thus sub-

1. Willessi also devised land on the Makah Reservation to Williams. Williams does not dispute the decisions below holding that he is not a permissible devisee of this land. We therefore express no opinion on this issue.

ject to de novo review. *See* 5 U.S.C. § 706 (1983) *Cultee v. United States,* 713 F.2d 1455, 1457 (9th Cir.1983) *cert. denied,* — U.S. ——, 104 S.Ct. 2150, 80 L.Ed.2d 537 (1984).[2]

## II

### IRA Restrictions on Land Transfer

The IRA restricts transfers of trust lands on the Quinault Reservation. IRA § 4 (codified as amended at 25 U.S.C. § 464 (1983)).[3] IRA section 4 generally prohibits transfers of trust lands, but provides that the Secretary of the Interior may approve certain transfers. *Id.* "Among the transfers that the Secretary may approve are devises to the members of the Indian tribe in which the lands ... are located." *Id.*

Appellants contend that the Quinault Tribe is the only tribe in which the property at issue is located. Williams, in contrast, insists that the Quileute Tribe should also qualify as a tribe in which the land is located. This distinction is the crux of this appeal.

## III

### Williams is a Permissible Devisee

**A. The Tribe Contemplated By Section 4**

The language of section 4 gives little guidance concerning the meaning of the phrase "the Indian Tribe in which the lands ... are located." An Indian tribe is usually considered to be a political entity, not a geographical area. What Congress intend-ed by referring to the tribe in which the lands are located is therefore not immediately apparent. We may derive guidance in the interpretation of section 4, however, from the General Allotment Act of 1887 ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331 et seq. (1983) ("GAA"), the system governing Indian landholding until Congress enacted the IRA; the IRA was enacted specifically to remedy problems that had been created primarily by the GAA. *See Readjustment of Indian Affairs: Hearings on HR 7902 Before the House Committee on Indian Affairs,* 73d Cong., 2d Sess. (1934) 15–17, 25–27 ("Readjustment Hearings"); *To Grant to Indians Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise: Hearings on S. 2755 and S. 3645: Before the Senate Committee on Indian Affairs,* 73d Cong., 2d Sess (1934) 15–16, ("Hearings on S. 2755 and S. 3645").

Under the GAA, the Government parcelled out a set number of acres of reservation property to each individual Indian, a larger set acreage for each family. *Id.* The government held some of the allotments in trust for allottees; other allottees received title to their property. *See* W. Canby, *American Indian Law,* 20–21 (1981); F. Cohen, *Handbook of Federal Indian Law,* 136–38 (2d ed. 1982). The government purchased most of the reservation property remaining after eligible allottees had received their allotments and resold it to settlers. Canby, *supra,* at 20.

---

**2.** Before analyzing the effect of the IRA on Williams' status as a devisee of Quinault Reservation land, we must determine whether the IRA applies to the Quinault Reservation. This threshold inquiry is easily resolved because we have previously applied the IRA to this reservation. *See Cultee v. United States,* 713 F.2d 1455 (9th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2150, 80 L.Ed.2d 537 (1984) (applying the IRA to the Quinault Reservation). We reaffirm that holding here.

**3.** The text of Section 4 reads, in relevant part, as follows:

[N]o sale, devise, gift, exchange, or other transfer of restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized hereunder, shall be made or approved: *Provided, however,* That such lands or interests may, with the approval of the Secretary of the Interior, be sold, devised, or otherwise transferred to the Indian tribe in which the lands or shares are located ... and in all instances such lands or interests shall descend or be devised, in accordance with the then existing laws of the State, or Federal laws where applicable, in which said lands are located ... to any member of such tribe or of such corporation or any heirs or lineal descendants of such member or any other Indian person for whom the Secretary of the Interior determines that the United States may hold land in trust.

25 U.S.C. § 464 (1983).

By the 1930's, Indian landholdings on reservations subject to the GAA had decreased by over 85%, and Indians were increasingly impoverished. *See Readjustment Hearings, supra,* at 15–17; *Hearings on S. 2755 and S. 3645, supra,* at 16–19. Many of the allotments to which Indians had held title had fallen into non-Indian hands. *Id.;* Cohen, *supra,* at 138. This phenomenon, combined with the government's sales of surplus property to non-Indians, had caused reservations to become checkerboards of Indian-held and non-Indian-held land. *Id.* As a result, the remaining Indian parcels were too small to be useful for grazing, the sole possible use for most of the parcels. *Id.* Non-Indians leased most of the parcels, generally at unfairly low rents. *Id.*

In enacting the IRA, Congress first contemplated that *all* Indian property would be held and administered by a tribe or a community, which was apparently intended to be either an amalgamation of all tribes on a reservation or in an area or a small segment of such reservation or area. *See, e.g., Readjustment Hearings, supra,* at 26–27, 160; *Hearings on S. 2755 and S. 2645, supra,* at 26–27. Individual Indians would receive shares in tribal or community assets in exchange for their parcels and would have a preferred right to use what had been their property. *Id.* Indians, however, opposed this communal ownership. *See, e.g., Readjustment Hearings, supra,* at 160, 235–37, 299 (Statements of Vern E. Thompson, representing the Quapaw Tribe, James Saluskin, representing the Yakima Tribe, and Ute Arapaho, representing the Cheyenne-Arapaho Tribe). Thus, Congress abandoned the tribal or community ownership concept. *See, e.g., Hearings on S. 2755 and S. 3645, supra,* at 231–237; 25 U.S.C. §§ 461 et seq. (1983). The version of the IRA that was finally enacted provided that tribes would own and manage lands that the government had sold under the GAA and was directed to repurchase. *See id.* That version also, rather than providing for transfer of individually held property to a tribe or community, extended trust periods and included section 4, which permits Indian landholders to transfer their lands only to other members of the tribe in which the lands are located. *See id.*

■ If Congress had intended that in areas in which multiple tribes having property rights had not formed a community, only one tribe would manage the property and thus be the tribe in which the lands are located under section 4, it must also have intended to divest the other tribes and designate that one tribe. Congress did not do so, or refer to tribes as being any other than those having property rights in an area. We therefore conclude that section 4 comprehends all tribes having property rights in an area. To hold otherwise would require courts to determine which tribes could manage land and which would be divested of their property rights in each reservation or area in which multiple tribes having property rights have not formed a community. We decline to do this. Although courts routinely determine property rights, Indian property rights are unique in that they are directly conferred and subject to comprehensive statutory and administrative regulation. Thus, we decline to hold that IRA divests Indian tribes of existing property rights absent some indication that Congress so intended.

The GAA gave individual Indians property rights in trust lands if their tribes had rights in those lands. The Supreme Court has recognized that the Quileute Tribe had rights in the Quinault Reservation such that its members were entitled to allotments there. In *United States v. Payne,* 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924), the Court found that members of the Quileute Tribe were entitled to allotments of timber land, as well as agricultural land, on the Quinault Reservation. *Payne,* 264 U.S. at 448–49, 44 S.Ct. at 352–53. This holding, based on the Quileute Tribe's rights under the Treaty of Olympia, necessarily assumes that the Quileute Tribe has rights in the Quinault Reservation.

**B. The Quileute Tribe has Treaty Rights in the Quinault Reservation**

██ We turn to an examination of the source of the Quileute Tribe's claimed interest in the Quinault Reservation. Indian tribes may acquire property interests by treaty. *See* F. Cohen, *Handbook of Federal Indian Law,* 472 (2d ed. 1982). Under the Treaty of Olympia, the Quinault and Quileute Tribes ceded their lands to the United States. Treaty between the United States and the Quinault and Quileute Indians (Treaty of Olympia), Art. 1, 12 Stat. 971 (1855 and 1856) *reprinted in* II C. Kappler, *Indian Law and Treaties* 719 (1904). In return, the treaty provided that the President would select land in Washington "sufficient for their wants" for their use and occupancy. *Id.* at art. 2. The treaty further provided that the tribes agreed to move onto the reservation within one year of ratification of the treaty.

In 1873, pursuant to the Treaty of Olympia, President Grant issued an executive order setting aside 350 square miles of land for the use of the Quinaults, Quileutes, two other named tribes, and "other tribes of fish-eating Indians on the Pacific coast." Executive Order of November 4, 1873, *reprinted in* I C. Kappler, *Indian Laws and Treaties* 923 (1904). This reservation became known as the Quinault Reservation.

**C. The Quileute Tribe's Treaty Rights Have Not Been Abrogated**

**1. Congress has not abrogated the Quileute Tribe's treaty rights.**

██ Congress may abrogate rights reserved to Indian tribes in treaties. To abrogate treaty rights, however, Congress must clearly and unequivocally express its intent to do so. *State of Idaho v. Andrus,* 720 F.2d 1461, 1464 (9th Cir.1983). We do not find that Congress expressed such intent.

██ Appellants contend that Congress manifested its intent to abrogate by designating the Quinault Tribe as representative of all Indians on the Quinault Reservation. We disagree. In 1947 Congress designated the Quinault Tribe as the proper plaintiff to litigate a boundary dispute on behalf of all Indians with interests in the Quinault Reservation. Act of July 24, 1947, 61 Stat. 416 (1947). Rather than generally acknowledging that the Quinault Tribe was the sole tribe having jurisdiction over the Quinault Reservation, however, Congress permitted the Quinault Tribe to represent Indians with interests in the reservation only in a particular action, which was identified by number. *See* H.Rep. No. 671, 80th Cong., 1st Sess. (1947). The Court of Claims had held that the Quinault Tribe could not recover for the value of land that the United States had appropriated because it determined that other tribes, including the Quileute Tribe, had interests in the land under the Treaty of Olympia and Executive Order of November 4, 1873. *Quinaielt Tribe v. United States,* 102 Ct.Cl. 822, 834–35 (1945).

**2. The Quinault Tribe's unilateral action has not abrogated the Quileute Tribe's rights.**

The IRA does not mandate that the tribe in which the lands are located be one tribe. *See* IRA § 19, 25 U.S.C. § 479 (1983) (defining "tribe" as including "the Indians residing on one reservation"). Nevertheless, appellees contend that only the Quinault Indian Nation has exclusive rights in Quinault Reservation property primarily because: (1) a separate reservation was set apart for the Quileutes sixteen years after the Quinault Reservation was set aside; and (2) its tribal council, according to its by-laws, has made and enforced various rules on the Quinault Reservation.[4] We

---

**4.** The Quinault Indian Nation also contends that the Department of the Interior has recognized it as the sole tribe exercising jurisdiction over the Quinault Reservation. The authority the Quinault Tribe cites for this proposition is the Department's list of tribes that it has determined

are eligible to receive Bureau of Indian Affairs services. 47 Fed.Reg. 53,130 (1982). There is no suggestion that the geographical or reservation designations, which are not listed for all of the tribes, were included for any purpose other than assisting in identifying the tribes. Accord-

find that none of these has divested the Quileute Tribe of its rights under the Treaty of Olympia.

■ First, the creation of a separate reservation for the Quileute Tribe did not extinguish all Quileute treaty rights in the Quinault Reservation. In 1889 a reservation was set aside exclusively for the Quileute Tribe. Executive Order of February 19, 1889, *reprinted in* I C. Kappler, *Indian Laws and Treaties* 923 (1904). Although the treaty specifically authorized the President to remove Indians from the Quinault Reservation, *see* Treaty of Olympia, art. 6, the Quileute Tribe was never so removed.

■ Second, the Quinault Tribal Council's exercise of jurisdiction over the Quinault Reservation to make and enforce rules also does not foreclose the Quileute Tribe's property rights in the Quinault Reservation.[5] The rules that the tribal council has made and enforced have involved such areas as building, health, and safety, *see Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir.), *cert. denied*, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982), and zoning, *see Sechrist v. Quinault*, 9 Indian L.Rep. 3064 (W.D.Wash. May 7, 1982). The mere fact that the Quinault Tribe has exercised power over the Quinault Reservation to make rules improving the overall quality of life for its inhabitants does not, however, lead

inevitably to a conclusion that no other body has any rights in the reservation for any purpose. Even if the Quinault Tribe's rulemaking power were exclusive, that should not prevent other tribes from having property rights in the Quinault Reservation.

3. The Quileute Tribe has not extinguished its rights in the Quinault Reservation.

■ The Quileute Tribe's failure to state expressly in its constitution that the Quinault Reservation is part of its territory does not extinguish the tribe's property rights in the reservation.[6] Treaty rights may be extinguished only in rare instances. Laches or estoppel may not defeat treaty rights. *Swim v. Bergland*, 696 F.2d 712, 718 (9th Cir.1983). Additionally, the Supreme Court has implied that a tribe may not unilaterally relinquish jurisdiction absent explicit congressional authorization and strict compliance with statutory requirements. *See Kennerly v. District Court*, 400 U.S. 423, 426–29, 91 S.Ct. 480, 481–83, 27 L.Ed.2d 507 (1971). In *Kennerly*, Congress had specifically authorized tribes to grant concurrent civil jurisdiction to the state in which the tribe was located. *Id.* at 424–25, 91 S.Ct. at 481. The statute required, however, that for the grant to be

---

ingly, the reservation designations are entitled to little weight. *Cf. Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 580–81 (1st Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979), (questioning the deference due Department's determination of tribal status, issue on which the Department "has not historically spent much effort").

Appellees also contend that this court recognized in *Quinault Tribe v. Gallagher*, 368 F.2d 648, 655 (9th Cir.1966) (on rehearing) that the Quinault Tribe exercises exclusive jurisdiction over the Quinault Reservation. Although we stated in *Gallagher* that the Quinault Tribe had a governing body "duly recognized by the Secretary of the Interior," we did so only for the purpose of 28 U.S.C. § 1362 (1983), which permits tribes having such governing bodies to bring certain actions in district court. *Gallagher*, 368 F.2d at 655–56. We did not hold that the Quinault Tribe exercises or may exercise exclusive jurisdiction over the Quinault Reservation. *See id.*

5. The Quinault Tribal Council's By-Laws do not specify the duties of the tribal council. *See* Quinault Tribal Council Bylaws (1972). We note also that the Quinault Indian Nation By-laws have not been approved by the Secretary of the Interior, although the IRA provision which permits tribes to adopt constitutions so requires. IRA § 16, 25 U.S.C. § 476 (1982).

6. The Quileute Tribe Constitution and By-Laws states:

Article I—Territory
The jurisdiction of the Quileute Tribe shall include all the territory within the original confines of the Quileute Reservation as set forth by Executive Order of February 19, 1889, and shall extend to such other lands as have been or may hereafter be added thereto under any law of the United States, except as otherwise provided by law.

effective, a majority of tribal members had to vote to permit the grant. *Id.* at 429, 91 S.Ct. at 483. Because only the tribal council, and not the tribal members, had voted to allow the grant, the Court held that the state had no civil jurisdiction.[7] If the tribal council in *Kennerly* could not explicitly extinguish its rights pursuant to congressional authorization, the Quileute Tribe could not have implicitly extinguished its rights, absent congressional authorization, here.

We therefore hold that both the Quileute Tribe and the Quinault Tribe exercise jurisdiction over the Quinault Reservation and either may be considered the tribe in which the lands are located for purposes of IRA § 4.[8] A member of either tribe is therefore a permissible devisee of Quinault Reservation lands under IRA § 4. Accordingly, we reverse and order distribution of the Quinault Reservation land to Williams as provided by Willessi's will.

REVERSED.

---

7. Appellees contend that the Quileute Tribe could extinguish its rights by failing to expressly exercise them in its constitution, citing *Quechan Tribe v. Rowe*, 531 F.2d 408 (9th Cir.1976). *Quechan Tribe*, however, is inapplicable here. In *Quechan Tribe*, we held that we did not need to consider whether the tribe had criminal jurisdiction over non-members because the tribal constitution limited the tribe's criminal jurisdiction to members. *Quechan Tribe*, 531 F.2d at 411. We also pointed out there that whether a tribe could exercise criminal jurisdiction over non-members under any circumstances was an open question. *See id.* at 411 n. 4. A tribe may, however, exercise civil jurisdiction over non-members. *See Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587 (9th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984).

8. We do not reach Williams's contentions that appellees are barred from attacking Willessi's will, IRA § 4 denies him equal protection, or collateral heirs as well as heirs are permissible devisees under IRA § 4.

We do not consider here whether tribes other than the Quinault and Quileute also have jurisdiction over the Quinault Reservation for IRA § 4 purposes under the Executive Order of November 4, 1873. Further, we do not consider the extent of the Quileute Tribe's jurisdiction over the Quinault Reservation. *Cf. Healing v. Jones*, 210 F.Supp. 125 (D.Ariz.1962), *aff'd*, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963) (Hopi and Navajo Tribes held to have joint, equal interest in parcel of reservation land).